BODDIE ET AL. *v.* CONNECTICUT ET AL.

No. 27. Argued December 8, 1969—Reargued November 17, 1970—
Decided March 2, 1971

HARLAN, J., delivered the opinion of the Court, in which BURGER, C. J., and STEWART, WHITE, MARSHALL, and BLACKMUN, JJ., joined. DOUGLAS, J., filed an opinion concurring in the result, *post,* p. 383. BRENNAN, J., filed an opinion concurring in part, *post,* p. 386. BLACK, J., filed a dissenting opinion, *post,* p. 389.

*Arthur B. LaFrance* reargued the cause and filed briefs for appellants.

*Raymond J. Cannon,* Assistant Attorney General of Connecticut, reargued the cause for appellees. With him on the brief were *Robert K. Killian,* Attorney General, and *William S. Kaplan.*

*Allan Ashman* filed a brief for the National Legal Aid and Defender Association as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed by *Francis B. Burch,* Attorney General of Maryland, and *J. Michael McWilliams,* Assistant Attorney General, joined by *George F. Kugler, Jr.,* Attorney General of New Jersey, and *Stephen Skillman,* Assistant Attorney General, and by the following Attorneys General: *David P.*

*Buckson* of Delaware, *Jack P. F. Gremillion* of Louisiana, *Clarence A. H. Meyer* of Nebraska, *Harvey Dickerson* of Nevada, *Helgi Johanneson* of North Dakota, and *Lee Johnson* of Oregon.

MR. JUSTICE HARLAN delivered the opinion of the Court.

Appellants, welfare recipients residing in the State of Connecticut, brought this action in the Federal District Court for the District of Connecticut on behalf of themselves and others similarly situated, challenging, as applied to them, certain state procedures for the commencement of litigation, including requirements for payment of court fees and costs for service of process, that restrict their access to the courts in their effort to bring an action for divorce.

It appears from the briefs and oral argument that the average cost to a litigant for bringing an action for divorce is $60. Section 52–259 of the Connecticut General Statutes provides: "There shall be paid to the clerks of the supreme court or the superior court, for entering each civil cause, forty-five dollars . . . ." An additional $15 is usually required for the service of process by the sheriff, although as much as $40 or $50 may be necessary where notice must be accomplished by publication.[1]

There is no dispute as to the inability of the named appellants in the present case to pay either the court fees required by statute or the cost incurred for the service of process. The affidavits in the record establish that appellants' welfare income in each instance barely suffices

---

[1] App. 9. The dollar figures are averages taken from the undisputed allegations of the complaint. The particular fee the sheriff receives from the plaintiff for service of process in any one case depends on the distance he must travel to effectuate service of process. Conn. Gen. Stat. Rev. § 52–261 (1968).

to meet the costs of the daily essentials of life and includes no allotment that could be budgeted for the expense to gain access to the courts in order to obtain a divorce. Also undisputed is appellants' "good faith" in seeking a divorce.

Assuming, as we must on this motion to dismiss the complaint, the truth of the *undisputed* allegations made by the appellants, it appears that they were unsuccessful in their attempt to bring their divorce actions in the Connecticut courts, simply by reason of their indigency. The clerk of the Superior Court returned their papers "on the ground that he could not accept them until an entry fee had been paid." App. 8–9. Subsequent efforts to obtain a judicial waiver of the fee requirement and to have the court effect service of process were to no avail. *Id.,* at 9.

Appellants thereafter commenced this action in the Federal District Court seeking a judgment declaring that Connecticut's statute and service of process provisions, "requiring payment of court fees and expenses as a condition precedent to obtaining court relief [are] unconstitutional [as] applied to these indigent [appellants] and all other members of the class which they represent." As further relief, appellants requested the entry of an injunction ordering the appropriate officials to permit them "to proceed with their divorce actions without payment of fees and costs." A three-judge court was convened pursuant to 28 U. S. C. § 2281, and on July 16, 1968, that court concluded that "a state [may] limit access to its civil courts and particularly in this instance, to its divorce courts, by the requirement of a filing fee or other fees which effectively bar persons on relief from commencing actions therein." 286 F. Supp. 968, 972.

We noted probable jurisdiction, 395 U. S. 974 (1969). The case was heard at the 1969 Term and thereafter was

set for reargument at the present Term. 399 U. S. 922
(1970). We now reverse.[2] Our conclusion is that, given
the basic position of the marriage relationship in this so-
ciety's hierarchy of values and the concomitant state
monopolization of the means for legally dissolving this
relationship, due process does prohibit a State from
denying, solely because of inability to pay, access to its
courts to individuals who seek judicial dissolution of their
marriages.

## I

At its core, the right to due process reflects a funda-
mental value in our American constitutional system.
Our understanding of that value is the basis upon which
we have resolved this case.

Perhaps no characteristic of an organized and cohesive
society is more fundamental than its erection and enforce-
ment of a system of rules defining the various rights and
duties of its members, enabling them to govern their af-
fairs and definitively settle their differences in an orderly,
predictable manner. Without such a "legal system,"
social organization and cohesion are virtually impossible;
with the ability to seek regularized resolution of con-
flicts individuals are capable of interdependent action
that enables them to strive for achievements without
the anxieties that would beset them in a disorganized
society. Put more succinctly, it is this injection of the
rule of law that allows society to reap the benefits of
rejecting what political theorists call the "state of
nature."

---

[2] Following colloquy at the oral reargument as to the possible avail-
ability of public or private funds to enable plaintiffs-appellants to
defray the expense requirements at issue in this case, the parties
submitted further papers on this score. Nothing in these materials
would justify our declining to adjudicate the constitutional question
squarely presented by this record.

American society, of course, bottoms its systematic definition of individual rights and duties, as well as its machinery for dispute settlement, not on custom or the will of strategically placed individuals, but on the common-law model. It is to courts, or other quasi-judicial official bodies, that we ultimately look for the implementation of a regularized, orderly process of dispute settlement. Within this framework, those who wrote our original Constitution, in the Fifth Amendment, and later those who drafted the Fourteenth Amendment, recognized the centrality of the concept of due process in the operation of this system. Without this guarantee that one may not be deprived of his rights, neither liberty nor property, without due process of law, the State's monopoly over techniques for binding conflict resolution could hardly be said to be acceptable under our scheme of things. Only by providing that the social enforcement mechanism must function strictly within these bounds can we hope to maintain an ordered society that is also just. It is upon this premise that this Court has through years of adjudication put flesh upon the due process principle.

Such litigation has, however, typically involved rights of defendants—not, as here, persons seeking access to the judicial process in the first instance. This is because our society has been so structured that resort to the courts is not usually the only available, legitimate means of resolving private disputes. Indeed, private structuring of individual relationships and repair of their breach is largely encouraged in American life, subject only to the caveat that the formal judicial process, if resorted to, is paramount. Thus, this Court has seldom been asked to view access to the courts as an element of due process. The legitimacy of the State's monopoly over techniques of final dispute settlement, even where

some are denied access to its use, stands unimpaired where recognized, effective alternatives for the adjustment of differences remain. But the successful invocation of this governmental power by plaintiffs has often created serious problems for defendants' rights. For at that point, the judicial proceeding becomes the only effective means of resolving the dispute at hand and denial of a defendant's full access to that process raises grave problems for its legitimacy.

Recognition of this theoretical framework illuminates the precise issue presented in this case. As this Court on more than one occasion has recognized, marriage involves interests of basic importance in our society. See, e. g., *Loving* v. *Virginia,* 388 U. S. 1 (1967); *Skinner* v. *Oklahoma,* 316 U. S. 535 (1942); *Meyer* v. *Nebraska,* 262 U. S. 390 (1923). It is not surprising, then, that the States have seen fit to oversee many aspects of that institution. Without a prior judicial imprimatur, individuals may freely enter into and rescind commercial contracts, for example, but we are unaware of any jurisdiction where private citizens may covenant for or dissolve marriages without state approval. Even where all substantive requirements are concededly met, we know of no instance where two consenting adults may divorce and mutually liberate themselves from the constraints of legal obligations that go with marriage, and more fundamentally the prohibition against remarriage, without invoking the State's judicial machinery.

Thus, although they assert here due process rights as would-be plaintiffs, we think appellants' plight, because resort to the state courts is the only avenue to dissolution of their marriages, is akin to that of defendants faced with exclusion from the only forum effectively empowered to settle their disputes. Resort to the judicial process by these plaintiffs is no more voluntary in a realistic sense than that of the defendant called upon to

defend his interests in court. For both groups this process is not only the paramount dispute-settlement technique, but, in fact, the only available one. In this posture we think that this appeal is properly to be resolved in light of the principles enunciated in our due process decisions that delimit rights of defendants compelled to litigate their differences in the judicial forum.

## II

These due process decisions, representing over a hundred years of effort by this Court to give concrete embodiment to this concept, provide, we think, complete vindication for appellants' contentions. In particular, precedent has firmly embedded in our due process jurisprudence two important principles upon whose application we rest our decision in the case before us.

## A

Prior cases establish, first, that due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard. Early in our jurisprudence, this Court voiced the doctrine that "[w]herever one is assailed in his person or his property, there he may defend," *Windsor* v. *McVeigh*, 93 U. S. 274, 277 (1876). See *Baldwin* v. *Hale*, 1 Wall. 223 (1864); *Hovey* v. *Elliott*, 167 U. S. 409 (1897). The theme that "due process of law signifies a right to be heard in one's defence," *Hovey* v. *Elliott, supra*, at 417, has continually recurred in the years since *Baldwin*, *Windsor*, and *Hovey*.[3] Although "[m]any controver-

---

[3] See *Goldberg* v. *Kelly*, 397 U. S. 254 (1970); *Sniadach* v. *Family Finance Corp.*, 395 U. S. 337 (1969); *Armstrong* v. *Manzo*, 380 U. S. 545 (1965); *Schroeder* v. *New York*, 371 U. S. 208, 212 (1962); *Best* v. *Humboldt Placer Mining Co.*, 371 U. S. 334, 338

sies have raged about the cryptic and abstract words of the Due Process Clause," as Mr. Justice Jackson wrote for the Court in *Mullane* v. *Central Hanover Tr. Co.,* 339 U. S. 306 (1950), "there can be no doubt that at a minimum they require that deprivation of life, liberty or property by adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case." *Id.,* at 313.

Due process does not, of course, require that the defendant in every civil case actually have a hearing on the merits. A State, can, for example, enter a default judgment against a defendant who, after adequate notice, fails to make a timely appearance, see *Windsor, supra,* at 278, or who, without justifiable excuse, violates a procedural rule requiring the production of evidence necessary for orderly adjudication, *Hammond Packing Co.* v. *Arkansas,* 212 U. S. 322, 351 (1909). What the Constitution does require is "an *opportunity* . . . granted at a meaningful time and in a meaningful manner,"*Armstrong* v. *Manzo,* 380 U. S. 545, 552 (1965) (emphasis added), "for [a] hearing appropriate to the nature of the case," *Mullane* v. *Central Hanover Tr. Co., supra,* at 313. The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.[4] That the hearing required by due process

_____

(1963); *Covey* v. *Town of Somers,* 351 U. S. 141 (1956); *Mullane* v. *Central Hanover Tr. Co.,* 339 U. S. 306 (1950); *Anderson Nat. Bank* v. *Luckett,* 321 U. S. 233, 246 (1944); *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 152–153 (1941); *Morgan* v. *United States,* 304 U. S. 1 (1938); *United States* v. *Illinois Central R. Co.,* 291 U. S. 457, 463 (1934); *Brinkerhoff-Faris Trust & Savings Co.* v. *Hill,* 281 U. S. 673 (1930); *Coe* v. *Armour Fertilizer Works,* 237 U. S. 413, 423 (1915); *Londoner* v. *Denver,* 210 U. S. 373, 385–386 (1908); *Louisville & Nashville R. Co.* v. *Schmidt,* 177 U. S. 230, 236 (1900).

[4] Compare *Goldberg* v. *Kelly, supra,* with *In re Winship,* 397 U. S. 358 (1970). See also *Bowles* v. *Willingham,* 321 U. S. 503, 520–521 (1944).

is subject to waiver, and is not fixed in form does not affect its root requirement that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest,[5] except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after· the event.[6]  In short, "within the limits of practicability," *id.*, at 318, a State must afford to all individuals a meaningful opportunity to be heard if it is to fulfill the promise of the Due Process Clause.

## B

Our cases further establish that a statute or a rule may be held constitutionally invalid as applied when it operates to deprive an individual of a protected right although its general validity as a measure enacted in the legitimate exercise of state power is beyond question.  Thus, in cases involving religious freedom, free speech or assembly, this Court has often held that a valid statute was unconstitutionally applied in particular circumstances because it interfered with an individual's exercise of those rights.[7]

No less than these rights, the right to a meaningful opportunity to be heard within the limits of practicality, must be protected against denial by particular laws

---

[5] *Goldberg* v. *Kelly, supra; Sniadach* v. *Family Finance Corp., supra; Opp Cotton Mills* v. *Administrator, supra,* at 152–153; *United States* v. *Illinois Central R. Co., supra,* at 463; *Coe* v. *Armour Fertilizer Works, supra.*

[6] *Cafeteria & Restaurant Workers Union* v. *McElroy,* 367 U. S. 886 (1961); *Ewing* v. *Mytinger & Casselberry, Inc.,* 339 U. S. 594 (1950); *Fahey* v. *Mallonee,* 332 U. S. 245 (1947); *Bowles* v. *Willingham, supra; Yakus* v. *United States,* 321 U. S. 414 (1944).

[7] *E. g., Schneider* v. *State,* 308 U. S. 147 (1939); *Cantwell* v. *Connecticut,* 310 U. S. 296 (1940); *Bates* v. *Little Rock,* 361 U. S. 516, 527 (1960); *Sherbert* v. *Verner,* 374 U. S. 398 (1963).

that operate to jeopardize it for particular individuals. See *Mullane* v. *Central Hanover Tr. Co., supra; Covey* v. *Town of Somers,* 351 U. S. 141 (1956).

In *Mullane* this Court held that the statutory provision for notice by publication in a local newspaper, although sufficient as to beneficiaries of a trust whose interests or addresses were unknown to the trustee, was not sufficient notice under the Due Process Clause for known beneficiaries. Similarly, *Covey* held that notice by publication in a foreclosure action, even though sufficient to provide a normal person with an opportunity for a hearing, was not sufficient where the defendant was a known incompetent. The Court expressly rejected an argument that "the Fourteenth Amendment does not require the State to take measures in giving notice to an incompetent beyond those deemed sufficient in the case of the ordinary taxpayer." *Id.,* at 146.

Just as a generally valid notice procedure may fail to satisfy due process because of the circumstances of the defendant, so too a cost requirement, valid on its face, may offend due process because it operates to foreclose a particular party's opportunity to be heard. The State's obligations under the Fourteenth Amendment are not simply generalized ones; rather, the State owes to each individual that process which, in light of the values of a free society, can be characterized as due.

### III

Drawing upon the principles established by the cases just canvassed, we conclude that the State's refusal to admit these appellants to its courts, the sole means in Connecticut for obtaining a divorce, must be regarded as the equivalent of denying them an opportunity to be heard upon their claimed right to a dissolution of their marriages, and, in the absence of a sufficient counter-

vailing justification for the State's action, a denial of due process.[8]

The arguments for this kind of fee and cost requirement are that the State's interest in the prevention of frivolous litigation is substantial, its use of court fees and process costs to allocate scarce resources is rational, and its balance between the defendant's right to notice and the plaintiff's right to access is reasonable.

In our opinion, none of these considerations is sufficient to override the interest of these plaintiff-appellants in having access to the only avenue open for dissolving their allegedly untenable marriages. Not only is there no necessary connection between a litigant's assets and the seriousness of his motives in bringing suit,[9] but it is here beyond present dispute that appellants bring these actions in good faith. Moreover, other alternatives exist to fees and cost requirements as a means for conserving the time of courts and protecting parties from frivolous liti-

---

[8] At least one court has already recognized the special nature of the divorce action. Justice Sobel in a case like that before us took note of the State's involvement in the marital relationship:

"Marriage is clearly. marked with the public interest. In this State, a marriage cannot be dissolved except by 'due judicial proceedings. . . .' We have erected by statute a money hurdle to such dissolution by requiring in many circumstances the service of a summons by publication . . . . This hurdle is an effective barrier to [plaintiff's] access to the courts. The loss of access to the courts in an action for divorce is a right of substantial magnitude when only through the courts may redress or relief be obtained." *Jeffreys* v. *Jeffreys*, 58 Misc. 2d 1045, 1056, 296 N. Y. S. 2d 74, 87 (1968).

See also *Brown* v. *Chastain*, 416 F. 2d 1012, 1014 (CA5 1969) (Rives, J., dissenting).

[9] We think *Cohen* v. *Beneficial Loan Corp.*, 337 U. S. 541 (1949), has no bearing on this case. Differences between divorce actions and derivative actions aside, unlike *Cohen*, where we considered merely a statute on its face, the *application* of this statute here operates to cut off entirely access to the courts.

gation, such as penalties for false pleadings or affidavits, and actions for malicious prosecution or abuse of process, to mention only a few. In the same vein we think that reliable alternatives exist to service of process by a state-paid sheriff if the State is unwilling to assume the cost of official service. This is perforce true of service by publication which is the method of notice least calculated to bring to a potential defendant's attention the pendency of judicial proceedings. See *Mullane* v. *Central Hanover Tr. Co., supra.* We think in this case service at defendant's last known address by mail and posted notice is equally effective as publication in a newspaper.

We are thus left to evaluate the State's asserted interest in its fee and cost requirements as a mechanism of resource allocation or cost recoupment. Such a justification was offered and rejected in *Griffin* v. *Illinois,* 351 U. S. 12 (1956). In *Griffin* it was the requirement of a transcript beyond the means of the indigent that blocked access to the judicial process. While in *Griffin* the transcript could be waived as a convenient but not necessary predicate to court access, here the State invariably imposes the costs as a measure of allocating its judicial resources. Surely, then, the rationale of *Griffin* covers this case.

## IV

In concluding that the Due Process Clause of the Fourteenth Amendment requires that these appellants be afforded an opportunity to go into court to obtain a divorce, we wish to re-emphasize that we go no further than necessary to dispose of the case before us, a case where the *bona fides* of both appellants' indigency and desire for divorce are here beyond dispute. We do not decide that access for all individuals to the courts is a right that is, in all circumstances, guaranteed by the Due Process Clause of the Fourteenth Amendment so that its exercise may not be placed beyond the reach of any in-

dividual, for, as we have already noted, in the case before us this right is the exclusive precondition to the adjustment of a fundamental human relationship. The requirement that these appellants resort to the judicial process is entirely a state-created matter. Thus we hold only that a State may not, consistent with the obligations imposed on it by the Due Process Clause of the Fourteenth Amendment, pre-empt the right to dissolve this legal relationship without affording all citizens access to the means it has prescribed for doing so.

*Reversed.*

MR. JUSTICE DOUGLAS, concurring in the result.

I believe this case should be decided upon the principles developed in the line of cases marked by *Griffin* v. *Illinois,* 351 U. S. 12. There we considered a state law which denied persons convicted of a crime full appellate review if they were unable to pay for a transcript of the trial. MR. JUSTICE BLACK's opinion announcing the judgment of the Court stated:

> "Such a denial is a misfit in a country dedicated to affording equal justice to all and special privileges to none in the administration of its criminal law. There can be no equal justice where the kind of a trial a man gets depends on the amount of money he has. Destitute defendants must be afforded as adequate appellate review as defendants who have money enough to buy transcripts." *Id.,* at 19.

*Griffin* has had a sturdy growth. "Our decisions for more than a decade now have made clear that differences in access to the instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution." *Roberts* v. *LaVallee,* 389 U. S. 40, 42. See also *Williams* v. *Oklahoma City,* 395 U. S. 458; *Long* v. *District Court of Iowa,* 385 U. S. 192; *Draper* v. *Washington,* 372 U. S. 487. But

*Griffin* has not been limited to securing a record for indigents who appeal their convictions. If the more affluent have counsel on appeal, then counsel for indigents must be provided on appeal of a criminal conviction. *Douglas* v. *California,* 372 U. S. 353. The tie to *Griffin* was explicit. "In either case [*Griffin* or *Douglas*] the evil is the same: discrimination against the indigent." *Id.,* at 355.

In *Burns* v. *Ohio,* 360 U. S. 252, we invalidated a procedure whereby cases within the jurisdiction of the state supreme court would not be considered if a person could not pay the filing fee. In *Smith* v. *Bennett,* 365 U. S. 708, we held that requiring indigents to pay filing fees before a writ of habeas corpus could be considered in state court was invalid under the Equal Protection Clause. Here Connecticut has provided requirements for married couples to obtain divorces and because of filing fees and service of process one of the requirements is having the necessary money. The more affluent can obtain a divorce; the indigent cannot. This situation is comparable to *Burns* v. *Ohio,* and *Smith* v. *Bennett.*

The Due Process Clause on which the Court relies has proven very elastic in the hands of judges. "The doctrine that prevailed in *Lochner* [v. *New York,* 198 U. S. 45], *Coppage* [v. *Kansas,* 236 U. S. 1], *Adkins* [v. *Children's Hospital,* 261 U. S. 525], [*Jay*] *Burns* [*Baking Co.* v. *Bryan,* 264 U. S. 504], and like cases—that due process authorizes courts to hold laws unconstitutional when they believe the legislature has acted unwisely— has long since been discarded." *Ferguson* v. *Skrupa,* 372 U. S. 726, 730. I would not invite its revival.

Whatever residual element of substantive law the Due Process Clause may still have (*Thompson* v. *Louisville,* 362 U. S. 199), it essentially regulates procedure. *Sniadach* v. *Family Finance Corp.,* 395 U. S. 337; *Wisconsin* v. *Constantineau,* 400 U. S. 433. The Court today puts

"flesh" upon the Due Process Clause by concluding that marriage and its dissolution are so important that an unhappy couple who are indigent should have access to the divorce courts free of charge. Fishing may be equally important to some communities. May an indigent be excused if he does not obtain a license which requires payment of money that he does not have? How about a requirement of an onerous bond to prevent summary eviction from rented property? The affluent can put up the bond, though the indigent may not be able to do so. See *Williams* v. *Shaffer*, 385 U. S. 1037. Is housing less important to the mucilage holding society together than marriage? The examples could be multiplied. I do not see the length of the road we must follow if we accept my Brother HARLAN's invitation. The question historically has been whether the right claimed is "of the very essence of a scheme of ordered liberty." *Palko* v. *Connecticut*, 302 U. S. 319, 325. That makes the test highly subjective and dependent on the idiosyncrasies of individual judges as *Lochner, Coppage,* and *Adkins* illustrate.

The reach of the Equal Protection Clause is not definable with mathematical precision. But in spite of doubts by some,* as it has been construed, rather definite guidelines have been developed: *race* is one (*Strauder* v. *West Virginia,* 100 U. S. 303; *McLaughlin* v. *Florida,* 379 U. S. 184); *alienage* is another (*Takahashi* v. *Fish & Game Comm'n,* 334 U. S. 410); *religion* is another (*Sherbert* v. *Verner,* 374 U. S. 398); *poverty* is still another (*Griffin* v. *Illinois, supra*); and *class* or *caste* yet another (*Skinner* v. *Oklahoma,* 316 U. S. 535).

The power of the States over marriage and divorce is, of course, complete except as limited by specific constitutional provisions. But could a State deny divorces to domiciliaries who were Negroes and grant them to whites?

*See Karst, Invidious Discrimination, 16 U. C. L. A. L. Rev. 716 (1969).

Deny them to resident aliens and grant them to citizens? Deny them to Catholics and grant them to Protestants? Deny them to those convicted of larceny and grant them to those convicted of embezzlement?

Here the invidious discrimination is based on one of the guidelines: *poverty*.

An invidious discrimination based on poverty is adequate for this case. While Connecticut has provided a procedure for severing the bonds of marriage, a person can meet every requirement save court fees or the cost of service of process and be denied a divorce. Connecticut says in its brief that this is justified because "the State does not favor divorces; and only permits a divorce to be granted when those conditions are found to exist, in respect to one or the other of the named parties, which seem to the legislature to make it probable that the interests of society will be better served and that parties will be happier, and so the better citizens, separate, than if compelled to remain together."

Thus, under Connecticut law divorces may be denied or granted solely on the basis of wealth. Just as denying further judicial review in *Burns* and *Smith,* appellate counsel in *Douglas,* and a transcript in *Griffin* created an invidious distinction based on wealth, so, too, does making the grant or denial of a divorce to turn on the wealth of the parties. Affluence does not pass muster under the Equal Protection Clause for determining who must remain married and who shall be allowed to separate.

Mr. Justice Brennan, concurring in part.

I join the Court's opinion to the extent that it holds that Connecticut denies procedural due process in denying the indigent appellants access to its courts for the sole reason that they cannot pay a required fee. "[C]onsideration of what procedures due process may require under any given set of circumstances must begin with

a determination of the precise nature of the government function involved as well as of the private interest that has been affected by governmental action." *Cafeteria & Restaurant Workers Union* v. *McElroy,* 367 U. S. 886, 895 (1961); *Goldberg* v. *Kelly,* 397 U. S. 254, 263 (1970). When a State's interest in imposing a fee requirement on an indigent is compared to the indigent's interest in being heard, it is clear that the latter is the weightier. It is an unjustifiable denial of a hearing, and therefore a denial of due process, to close the courts to an indigent on the ground of nonpayment of a fee.

But I cannot join the Court's opinion insofar as today's holding is made to depend upon the factor that only the State can grant a divorce and that an indigent would be locked into a marriage if unable to pay the fees required to obtain a divorce. A State has an ultimate monopoly of all judicial process and attendant enforcement machinery. As a practical matter, if disputes cannot be successfully settled between the parties, the court system is usually "the only forum effectively empowered to settle their disputes. Resort to the judicial process by these plaintiffs is no more voluntary in a realistic sense than that of the defendant called upon to defend his interests in court." *Ante,* at 376–377. In this case, the Court holds that Connecticut's unyielding fee requirement violates the Due Process Clause by denying appellants "an opportunity to be heard upon their claimed right to a dissolution of their marriages" without a sufficient countervailing justification. *Ante,* at 380. I see no constitutional distinction between appellants' attempt to enforce this state statutory right and an attempt to vindicate any other right arising under federal or state law. If fee requirements close the courts to an indigent he can no more invoke the aid of the courts for other forms of relief than he can escape the legal incidents of a marriage. The right to be heard in some way at some time extends

to all proceedings entertained by courts. The possible distinctions suggested by the Court today will not withstand analysis.

In addition, this case presents a classic problem of equal protection of the laws. The question that the Court treats exclusively as one of due process inevitably implicates considerations of both due process and equal protection. Certainly, there is at issue the denial of a hearing, a matter for analysis under the Due Process Clause. But Connecticut does not deny a hearing to everyone in these circumstances; it denies it only to people who fail to pay certain fees. The validity of this partial denial, or differentiation in treatment, can be tested as well under the Equal Protection Clause.

In *Griffin* v. *Illinois,* 351 U. S. 12 (1956), we held under the Equal Protection Clause as well as the Due Process Clause that a State may not deny a free transcript to an indigent, where the transcript is necessary for a direct appeal from his conviction. Subsequently, we have applied and extended that principle in numerous criminal cases. See, *e. g., Eskridge* v. *Washington State Board of Prison Terms & Paroles,* 357 U. S. 214 (1958); *Burns* v. *Ohio,* 360 U. S. 252 (1959); *Smith* v. *Bennett,* 365 U. S. 708 (1961); *Coppedge* v. *United States,* 369 U. S. 438 (1962); *Lane* v. *Brown,* 372 U. S. 477 (1963); *Draper* v. *Washington,* 372 U. S. 487 (1963); *Rinaldi* v. *Yeager,* 384 U. S. 305 (1966); *Long* v. *District Court of Iowa,* 385 U. S. 192 (1966); *Roberts* v. *LaVallee,* 389 U. S. 40 (1967); *Gardner* v. *California,* 393 U. S. 367 (1969). The rationale of *Griffin* covers the present case. Courts are the central dispute-settling institutions in our society. They are bound to do equal justice under law, to rich and poor alike. They fail to perform their function in accordance with the Equal Protection Clause if they shut their doors to indigent

plaintiffs altogether. Where money determines not merely "the kind of trial a man gets," *Griffin* v. *Illinois, supra,* at 19, but whether he gets into court at all, the great principle of equal protection becomes a mockery. A State may not make its judicial processes available to some but deny them to others simply because they cannot pay a fee. Cf. *Harper* v. *Virginia Board of Elections,* 383 U. S. 663 (1966). In my view, Connecticut's fee requirement, as applied to an indigent, is a denial of equal protection.

MR. JUSTICE BLACK, dissenting.

This is a strange case and a strange holding. Absent some specific federal constitutional or statutory provision, marriage in this country is completely under state control, and so is divorce. When the first settlers arrived here the power to grant divorces in Great Britain was not vested in that country's courts but in its Parliament. And as recently as 1888 this Court in *Maynard* v. *Hill,* 125 U. S. 190, upheld a divorce granted by the Legislature of the Territory of Oregon. Since that time the power of state legislatures to grant divorces or vest that power in their courts seems not to have been questioned. It is not by accident that marriage and divorce have always been considered to be under state control. The institution of marriage is of peculiar importance to the people of the States. It is within the States that they live and vote and rear their children under laws passed by their elected representatives. The States provide for the stability of their social order, for the good morals of all their citizens, and for the needs of children from broken homes. The States, therefore, have particular interests in the kinds of laws regulating their citizens when they enter into, maintain, and dissolve marriages. The power of the States over marriage and

divorce is complete except as limited by specific constitutional provisions. *Loving* v. *Virginia,* 388 U. S. 1, 7–12 (1967).

The Court here holds, however, that the State of Connecticut has so little control over marriages and divorces of its own citizens that it is without power to charge them practically nominal initial court costs when they are without ready money to put up those costs. The Court holds that the state law requiring payment of costs is barred by the Due Process Clause of the Fourteenth Amendment of the Federal Constitution. Two members of the majority believe that the Equal Protection Clause also applies. I think the Connecticut court costs law is barred by neither of those clauses.

It is true, as the majority points out, that the Court did hold in *Griffin* v. *Illinois,* 351 U. S. 12 (1956), that indigent defendants in criminal cases must be afforded the same right to appeal their convictions as is afforded to a defendant who has ample funds to pay his own costs. But in *Griffin* the Court studiously and carefully refrained from saying one word or one sentence suggesting that the rule there announced to control rights of criminal defendants would control in the quite different field of civil cases. And there are strong reasons for distinguishing between the two types of cases.

Criminal defendants are brought into court by the State or Federal Government to defend themselves against charges of crime. They go into court knowing that they may be convicted, and condemned to lose their lives, their liberty, or their property, as a penalty for their crimes. Because of this great governmental power the United States Constitution has provided special protections for people charged with crime. They cannot be convicted under bills of attainder or ex post facto laws. And numerous provisions of the Bill of Rights— the right to counsel, the right to be free from coerced

confessions, and other rights—shield defendants in state courts as well as federal courts. See, *e. g., Benton* v. *Maryland,* 395 U. S. 784 (1969); *Duncan* v. *Louisiana,* 391 U. S. 145 (1968); *Malloy* v. *Hogan,* 378 U. S. 1 (1964); *Gideon* v. *Wainwright,* 372 U. S. 335 (1963). With all of these protections safeguarding defendants charged by government with crime, we quite naturally and quite properly held in *Griffin* that the Due Process and Equal Protection Clauses both barred any discrimination in criminal trials against poor defendants who are unable to defend themselves against the State. Had we not so held we would have been unfaithful to the explicit commands of the Bill of Rights, designed to wrap the protections of the Constitution around all defendants upon whom the mighty powers of government are hurled to punish for crime.

Civil lawsuits, however, are not like government prosecutions for crime. Civil courts are set up by government to give people who have quarrels with their neighbors the chance to use a neutral governmental agency to adjust their differences. In such cases the government is not usually involved as a party, and there is no deprivation of life, liberty, or property as punishment for crime. Our Federal Constitution, therefore, does not place such private disputes on the same high level as it places criminal trials and punishment.. There is consequently no necessity, no reason, why government should in civil trials be hampered or handicapped by the strict and rigid due process rules the Constitution has provided to protect people charged with crime.

This distinction between civil and criminal proceedings is implicit in *Cohen* v. *Beneficial Loan Corp.,* 337 U. S. 541 (1949), where we held that a statute requiring some, but not all, plaintiffs in stockholder derivative actions to post a bond did not violate the Due Process or the Equal Protection Clause. The *Cohen* case is indistin-

guishable from the one before us. In *Cohen,* as here, the statute applied to plaintiffs. In both situations the legal relationships involved are creatures of the State, extensively governed by state law. The effect of both statutes may be to deter frivolous or ill-considered suits, and in both instances the State has a considerable interest in the prevention of such suits, which might harm the very relationship the State created and fostered. Finally, the effect of both statutes may be to close the state courts entirely to certain plaintiffs, a result the Court explicitly accepted in *Cohen.* See *id.,* at 552. I believe the present case should be controlled by the Court's thorough opinion in *Cohen.*

The Court's suggested distinction of *Cohen* on the ground that the Court there dealt only with the validity of the statute on its face ignores the following pertinent language:

> "It is urged that such a requirement will foreclose resort by most stockholders to the only available judicial remedy for the protection of their rights. Of course, to require security for the payment of any kind of costs, or the necessity for bearing any kind of expense of litigation, has a deterring effect. But we deal with power, not wisdom; and we think, notwithstanding this tendency, *it is within the power of a state to close its courts to this type of litigation if the condition of reasonable security is not met."* *Id.,* at 552. (Emphasis added.)

Rather, *Cohen* can only be distinguished on the ground that it involved a stockholders' suit, while this case involves marriage, an interest "of basic importance in our society." Thus the Court's opinion appears to rest solely on a philosophy that any law violates due process if it is unreasonable, arbitrary, indecent, deviates from the fundamental, is shocking to the conscience, or fails to meet

other tests composed of similar words or phrases equally lacking in any possible constitutional precision. These concepts, of course, mark no constitutional boundaries and cannot possibly depend upon anything but the belief of particular judges, at particular times, concerning particular interests which those judges have divined to be of "basic importance."

I do not believe the wise men who sought to draw a written constitution to protect the people from governmental harassment and oppression, who feared alike the king and the king's judges, would have used any such words or phrases. Such unbounded authority in any group of politically appointed or elected judges would unquestionably be sufficient to classify our Nation as a government of men, not the government of laws of which we boast. With a "shock the conscience" test of constitutionality, citizens must guess what is the law, guess what a majority of nine judges will believe fair and reasonable. Such a test wilfully throws away the certainty and security that lies in a written constitution, one that does not alter with a judge's health, belief, or his politics. I believe the only way to steer this country towards its great destiny is to follow what our Constitution says, not what judges think it should have said.

For these reasons I am constrained to repeat what I said in dissent in *Williams* v. *North Carolina*, 325 U. S. 226, 271–274 (1945):

> "I cannot agree to this latest expansion of federal power and the consequent diminution of state power over marriage and marriage dissolution which the Court derives from adding a new content to the Due Process Clause. The elasticity of that clause necessary to justify this holding is found, I suppose, in the notion that it was intended to give this Court unlimited authority to supervise all assertions of

> state and federal power to see that they comport with our ideas of what are 'civilized standards of law.' . . .
>
> . . . . .
>
> ". . . This perhaps is in keeping with the idea that the Due Process Clause is a blank sheet of paper provided for courts to make changes in the Constitution and the Bill of Rights in accordance with their ideas of civilization's demands. I should leave the power over divorces in the states."

See also *In re Winship,* 397 U. S. 358, 377 (1970) (BLACK, J., dissenting).

One more thought about the Due Process and Equal Protection Clauses: neither, in my judgment, justifies judges in trying to make our Constitution fit the times, or hold laws constitutional or not on the basis of a judge's sense of fairness. The Equal Protection Clause is no more appropriate a vehicle for the "shock the conscience" test than is the Due Process Clause. See, *e. g.,* my dissent in *Harper* v. *Virginia Board of Elections,* 383 U. S. 663, 675–680 (1966). The rules set out in the Constitution itself provide what is governmentally fair and what is not. Neither due process nor equal protection permits state laws to be invalidated on any such nonconstitutional standard as a judge's personal view of fairness. The people and their elected representatives, not judges, are constitutionally vested with the power to amend the Constitution. Judges should not usurp that power in order to put over their own views. Accordingly, I would affirm this case.