OPINION OF THE COURT
Jack Turret, J.
This decision supplements a decision dictated into the record on January 18, 1979 when the parties to this support petition agreed to a final order of support in the amount of $75 per week, and the court entered its order on consent. At that time the Department of Social Services (hereafter "DSS”) requested the court to specify the number of defaults by respondent that would trigger a payroll deduction order, as provided in recently amended section 49-b of the Personal Property Law (L 1978, ch 456, eff Jan. 1, 1979). In this case, on the facts elicited, the court declined, on the ground that a further hearing should be afforded this respondent in the event of a default. The court found that a payroll deduction order might seriously threaten respondent’s job and would amount to a taking of his property without a hearing as required under the Fourteenth Amendment of the United States Constitution. In order to fully document the reasons for its ruling, the court now supplements the decision dictated from the bench. It is noted that respondent herein waived counsel, and will probably not be represented on appeal. The brief in behalf of the DSS, which is represented by counsel, will not be countered by an opposing argument. In most of the support cases heard and decided by Family Court Judges, one or both parties lack counsel, and the court must assume the delicate dual role of Judge and advocate. This supplementary decision hopefully will present a viewpoint in behalf of an almost indigent respondent who chose to appear pro se.
Section 49-b of the Personal Property Law was amended last year so as to provide a means of entering a payroll deduction order automatically, after a specified number of defaults by the respondent, where the dependent family is receiving public assistance. The delinquent respondent is given 15 days in which to pay all arrears before his employer is served with the order. In contrast, for those respondents whose families are more fortunate in that they do not receive public assistance, a separate inquiry at the time of the initial support order or at any time thereafter, is held before a payroll deduction order is entered. Only after "good cause” is established does the court order a payroll deduction order against *174 those respondents. For those who are poor, the statute requires no initial showing of "good cause”.
DSS argues that the statute is mandatory. The statutory language is clear. The court, however, believes for reasons set out below, that in certain situations a hearing on the question of good cause may be required before DSS as assignee is entitled to a payroll deduction order. The arbitrary discrimination between respondents whose families receive assistance and those who do not, raises constitutional questions of due process and equal protection of the law. The court must evaluate and balance the State’s interest in conserving its public assistance funds, and the individual’s in protecting his job. The fiscal implications for State and local governments by the enactment of this bill is to increase the effectiveness of the child support enforcement program, thereby reducing State and local public assistance costs. (See DSS’s "Memorandum in Support of Legislation”, submitted to the Governor’s office on June 27, 1978.) According to the office of the Mayor of New York City "the respondent’s rights are protected in that no deduction order can be served without 15 days notice to the respondent of a determination of delinquency in payment and intention to serve such order on an employer. If payment of arrears is made within such time period, the order will not be served. If the respondent’s default is based on changed circumstances, the 15 days can be utilized to petition the court to change the order.” (See letter dated June 28, 1978 urging the Governor to sign the bill, in NY State Assembly legislative bill jacket; L 1978, ch 456.) The Family Court within the City of New York processes thousands of cases annually in which the DSS is concerned. In the vast majority of cases before this court in New York County, Part B, since January 1, 1979, the court has set the number of defaults upon which a payroll deduction order shall be made. But in this case, as in others, entry of a payroll deduction order might seriously jeopardize respondent’s job. This respondent, who speaks English poorly, is employed as a handyman earning take-home pay in the amount of $154 per week. His only asset is his job. His employer is S. Home for Adults, a firm having about 10 employees. The court does not know whether respondent would be protected by a job contract or a labor union, in the event his employer acted against him following entry of a payroll deduction order. Respondent appeared in court promptly, and agreed to pay $75 per week for the *175 support of his wife and four children. This is a reasonable sum in the circumstances. Viewing the totality of the facts, the court cannot be sanguine as respondent’s ability to hold his job — and stay off the welfare rolls himself — if his employer were forced to make weekly deductions and forward monthly sums to the DSS, as required by the statute, in the event respondent misses a set number of payments. The court views the threat to respondent’s livelihood as serious enough to invoke the constitutional protections of the Fourteenth Amendment, as in similar cases involving the taking of property. In welfare cases, for example, due process requires a pretermination evidenciary hearing (including an opportunity to confront witnesses and present oral testimony) before benefits are discontinued. (Goldberg v Kelly, 397 US 254.) As the Supreme Court stated, it is clear that "due process requires, at a minimum, that absent a countervailing state interest of overriding significance, persons forced to settled their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard.” (Boddie v Connecticut, 401 US 371, 377.) Further the court declared that "[w]hat the constitution does require is 'an opportunity . , . granted at a meaningful time and in a meaningful manner,’ Armstrong v. Manzo, 380 U. S. 545, 552”. (Boddie v Connecticut, supra, p 378.) The court must ask itself whether those constitutional requirements are met by this statute, as applied in this case.
Prior New York cases emphasize a respondent’s right to a hearing under the former statute (in which there was no provision for an "automatic” payroll deduction order in welfare cases) and in cases when the enforcement mechanism was civil contempt. The Appellate Division, Second Department, ruled that the trial court lacked authority to order a payroll deduction order where the respondent was denied an opportunity to be heard, the payroll deduction order having been issued while respondent’s petition for downward modification was pending. (Hsiung v Hsiung, 54 AD2d 972.) Other cases emphasize that mere failure to pay does not mean that the respondent willfully violated the order. (Matter of Stone v Stone, 54 AD2d 858; Matter of Lieberman v Lieberman, 51 AD2d 745.) In Thaw v Thaw (89 Misc 2d 18) the court pointed out that a payroll deduction order is a form of equitable relief, and is addressed to the discretion of the court. Some of the factors to be considered by the court were discussed several years earlier in Matter of Doe v Doe (37 Misc 2d 788) by Surrogate (then Family Court Judge) Midonick.
*176 Judge Midonick noted the reluctance of some Family Court personnel to utilize the payroll deduction order statute as it then existed, for fear of jeopardizing a respondent’s job. Pointing out that a "large proportion” of the respondents in New York City were protected from employer retaliation by their collective bargaining agreement and unions, the Judge found that a payroll deduction order was a fair and practical enforcement mechanism, and much preferable to the other sanctions — civil contempt and jail. However, acknowledging that not all respondents were similarly protected, the Judge respectfully asked the Legislature to consider amending section 49-b of the Personal Property Law so as to make it unlawful for an employer to act against an employee solely because a payroll deduction order had been entered, and to hold the employer liable for payments under the order if the employee was dismissed. That suggestion was paid heed by the passage of CPLR 5252, which does provide some protection. However, a small businessman can usually find some other excuse to discharge an employee, when the real reason is that the employer finds it burdensome to comply with the payroll deduction order.
In Doe the statute provided for payroll deduction orders to be entered upon a showing of good cause, for all respondents, whether their families were or were not receiving public assistance. It is true that a large percentage of respondents will be protected by unions and contracts. However, under the amended section 49-b, the "automatic” provision applies only to respondents whose families are on welfare. Among this population, it often happens that the respondent will be employed by a small firm without a collective bargaining agreement or a union. That appears to be the case herein.
The court has considered several questions, in addition to its paramount concern for responent’s right to a hearing. Is "default” defined to include a failure to make each payment in full, so that if respondent pays only $60 one week he is in default? Would a petition by respondent for a downward modification, based on a change in circumstances, be heard and decided before the payroll deduction order is served on the employer? (Not likely, given the congestion of this court.) Is respondent forced to forfeit his right to withhold support in situations in which he is unlawfully denied visitation? (Borax v Borax, 4 NY2d 113, 116; Feuer v Feuer, 50 AD2d 772; Callender v Callender, 37 AD2d 360.) Further, as a practical *177 matter, is it realistic to expect a respondent in straitened financial circumstances to pay arrears in a lump sum? (Matter of Doe v Doe, supra, p 792.)
The court concludes that respondent’s rights under the Fourteenth Amendment outweigh the State’s interest in efficient collection of support funds. The Bureau of the Budget in reporting to the Governor on this bill indicated a possible objection, stating, in a report received after action by the Governor, "The provision relating to wage assignment mandates an automatic garnishment order by the family court. As such, this provision may unnecessarily abridge the civil rights of persons who are making child support payments on a timely basis.” The court’s obligation to do justice, particularly serious in a case in which an equitable remedy is sought, cannot be removed by legislative fiat. In this case, the DSS has not presented a State interest of such "overriding” importance as to justify denial of a hearing on the merits before a payroll deduction order is ordered. The State’s concern for guarding the public purse is a valid one. It does not, however, support a statutory scheme in which for one set of respondents a payroll deduction order is within the discretion of the court and required only after a showing of good cause, and for another, it is an automatic result of default.
The court is not a rubber stamp for administrative recommendations, no matter how well intentioned. In this case, as in any other, the DSS will have the opportunity, upon a further application for enforcement of the instant support order pursuant to section 454 of the Family Court Act, to make a showing of good cause as to why a payroll deduction order should be entered against this particular respondent. Among the factors the court will then consider are whether mail is delivered regularly to respondent; whether respondent’s employer has the clerical resources with which to comply; whether respondent has or can obtain union or other protection in the event his employer retaliates, and, primarily, whether any failure to comply fully with the current order was justified.
The Family Court in these support cases has been called upon to do what should be done by administrative agencies. Judges should not be treated as administrative clerks. Where as here a Judge contemplates that his signing of an order setting the number of defaults upon which a payroll deduction order might cause a person to lose his job, departure from a *178 statute that is too rigid is proper. Judicial discretion has been too fully eroded in this instance. "This bill curtails the discretion of the family court (wage assignments, delivery of a summons by mail, use of hearing examiners, etc.). Consequently, it may be criticized as unnecessarily infringing on the authority of the judiciary.” (Bureau of the Budget Memorandum, par 5[c], NY Assembly legis bill jacket, L 1978, ch 456.)
For these reasons, the court declines to set a specific number of defaults after which the DSS would be entitled to serve a payroll deduction order on respondent’s employer.