702 A.2d 1384

ROBERT MISHLEN, PLAINTIFF-RESPONDENT, v. KATHLEEN MISHLEN, DEFENDANT-APPELLANT.

Superior Court of New Jersey
Appellate Division

Submitted November 5, 1997—Decided December 5, 1997.

644

Before Judges STERN, KLEINER and KIMMELMAN.

*Elliot H. Gourvitz*, attorney for appellant.

*Gary E. Fox*, attorney for respondent.

The opinion of the court was delivered by

STERN, J.A.D.

Defendant Kathleen Mishlen appeals from portions of a "Dual Judgment of Divorce," entered on December 10, 1996 following a six-day trial, which (1) awarded her $332 per week in child support for the parties' two children, (2) provided her with six months of rehabilitative alimony in the amount of $125 per week, (3) required that she "not expose the two minor children of the marriage to William Baldridge at any time or place, consistent with a Pendente Lite Consent Retraining Order" and (4) required that each party "pay their own respective counsel fees." The *pendente lite* consent order of October 18, 1993 has not been included in the record, but it is undisputed that it provided that the Mishlen children "shall not be in the presence of Mr. Baldridge at any time." Although in her trial testimony she disavowed any plan to marry Baldridge, in her brief on this appeal defendant asserts that

Baldridge is her "paramour and the individual she intends to marry."

Defendant argues:

POINT I  THE COURT FAILED TO MAKE CONCLUSIONS OF LAW IN REGARD TO RESTRAINING THE APPELLANT FROM EXPOSING THE CHILDREN FROM MR. BALDRIDGE.

POINT II  THE COURT'S DECISION TO FORBID THE APPELLANT FROM EXPOSING THE CHILDREN TO MR. BALDRIDGE IS UNCONSTITU-TIONAL AS IT IMPINGES UPON APPELLANT'S RIGHT TO MARRY MR. BALDRIDGE.

POINT III  THE COURT'S USE OF ITS "PARENS PATRIAE" RESPONSI-BILITY IN THE WITHIN MATTER IS MISPLACED AND CONSTITUTES REVERSIBLE ERROR.

POINT IV  WHAT THE RESPONDENT DID, IN ACTUALITY WAS RE-STRAIN MR. BALDRIDGE FROM BEING IN THE PRESENCE OF THE TWO MINOR CHILDREN, AND THIS CONSTITUTES REVERSIBLE ER-ROR.

POINT V  THE RESPONDENT DID NOT PROVE, AND DID NOT EVEN ALLEGE, THAT MR. BALDRIDGE HAD IN ANY WAY BEEN A DANGER TO THE TWO MINOR CHILDREN.

POINT VI  THE COURT ERRED BY NOT IMPOSING A LESS SEVERE RESTRICTION UPON THE APPELLANT THAN RESTRAINTS AGAINST HER FROM EXPOSING THE CHILDREN TO MR. BALDRIDGE IN ANY MANNER.

POINT VII  THE COURT ERRED IN REGARD TO BOTH THE AMOUNT OF AND THE DURATION OF REHABILITATIVE ALIMONY.

POINT VIII  THE COURT ABUSED ITS DISCRETION IN NOT AWARDING COUNSEL FEES TO THE APPELLANT.

Our careful review of the record leads us to conclude that these contentions are without merit and require only the following discussion.  *R.* 2:11–3(e)(1)(A)(E).

## I.

The trial testimony revealed instances of abusive conduct by Baldridge against the children of two of his prior wives, and there is sufficient evidence in the record to support the trial judge's finding that the Mishlen children "would be in danger with Mr. Baldridge." *See Rova Farms Resort Inc. v. Investors Ins. Co.,* 65 *N.J.* 474, 483–84, 323 *A.*2d 495 (1974).  Defendant's contention that there was no proof that Baldridge "acted in an inappro-

priate way to the two children of [the Mishlen] marriage" is irrelevant to the ultimate issue of their safety, as there was proof of a pattern of abuse of children with whom he previously lived. Moreover, the children need not become a member of Baldridge's household or become "victim[s] of domestic violence" so that a domestic violence restraining order can be obtained. *See N.J.S.A.* 2C:25–19(d). A restraining order can be obtained as part of the matrimonial proceedings relating to the custody of the children. *Cf. N.B. v. T.B.*, 297 *N.J.Super.* 35, 42, 687 *A.*2d 766 (App.Div. 1997) ("Disputes which do not rise to the level of domestic violence can and should be addressed and resolved by the Chancery Division, Family Part ... without necessarily relying on the Domestic Violence Act"). As the Supreme Court recently said in *Kinsella v. Kinsella*, 150 *N.J.* 276, 317–18, 696 *A.*2d 556 (1997):

> Of course, the primary and overarching consideration [in making a custody decision] is the best interest of the child. *See Fantony, supra,* 21 *N.J.* at 536 [122 *A.*2d 593] ("Our law in a cause involving the custody of a child is that the paramount consideration is the safety, happiness, physical, mental and moral welfare of a child"). The best-interest analysis is an additional requirement "superimposed upon an analysis of the statutory scheme." Moreover, that analysis requires the court to consider any and all material evidence....
>
> The "best-interest-of-the-child" standard is more than a statement of the primary criterion for decision or the factors to be considered; it is an expression of the court's special responsibility to safeguard the interests of the child at the center of a custody dispute because the child cannot be presumed to be protected by the adversarial process.
>
> [*Id.* at 317–18, 696 *A.*2d 556 (internal citations omitted).]

■ Defendant argues that by restraining her from exposing the children to Mr. Baldridge, the Family Part judge essentially infringed upon her constitutional right to marry Mr. Baldridge. While defendant testified at the trial that she had no present "plans to marry Mr. Baldridge" at the time, we address the issue in light of her testimony that she wanted to "establish a normal relationship" with Baldridge and her children together, and then decide about her future with Baldridge in that context.

In *Zablocki v. Redhail,* 434 *U.S.* 374, 383, 98 *S.Ct.* 673, 679, 54 *L.Ed.*2d 618, 628 (1978), the United States Supreme Court de-

clared that "the right to marry is of fundamental importance," giving rise to the right of privacy protected by the Fourteenth Amendment's Due Process clause. *See also, e.g., Boddie v. Connecticut,* 401 *U.S.* 371, 91 *S.Ct.* 780, 28 *L.Ed.*2d 113 (1971); *Loving v. Virginia,* 388 *U.S.* 1, 87 *S.Ct.* 1817, 18 *L.Ed.*2d 1010 (1967). The *Zablocki* decision concerned a Wisconsin statute which required court approval of a marriage by a parent with a prior support obligation. The Court concluded that the statute was unconstitutional because it "unnecessarily impinge[d] on the right to marry" and "significantly interfere[d] with the exercise of a fundamental right" without being "closely tailored to effectuate" the legitimate state interests of counselling the parent of "the necessity of fulfilling his prior support obligations" and of protecting "the welfare of the out-of-custody children." *Id.* at 388, 98 *S.Ct.* at 682, 54 *L.Ed.*2d at 631–32. Significantly, the Court found that the Wisconsin statute "interfer[ed] directly and substantially with the right to marry." *Id.* at 387, 98 *S.Ct.* at 681, 54 *L.Ed.*2d at 631; *id.* at 391, 98 *S.Ct.* at 683, 54 *L.Ed.*2d at 634 (Burger, C.J., concurring) (noting the "intentional and substantial interference with the right to marry.") [1]

Neither *Zablocki* nor any case brought to our attention suggests that a parent could not be required to make an election between (1) being the principal custodial parent with restrictions related to the custody, (2) marrying a spouse of choice and living with him or her away from the children, or (3) marrying and living part-time with each. (The parties to this matrimonial litigation agreed to "joint legal custody" with defendant designated as the "primary residential custodial parent," and the judgment so provided. Both parties are competent caring parents). Here, the order does not "directly" interfere with defendant's right to marry. Defendant is free to marry anyone she chooses, including Baldridge.

[1] Justices Stewart, Powell and Stevens wrote separate opinions concurring in the result. Justice Rehnquist dissented.

Our courts have recognized that the "best interests" of the children can be made paramount to other fundamental rights. *See Holder v. Polanski,* 111 *N.J.* 344, 350–51, 544 *A.*2d 852 (1988) (restricting the freedom of a custodial parent to move out of state when contrary to the "best interests of the children"). *See, generally, Shapiro v. Thompson,* 394 *U.S.* 618, 89 *S.Ct.* 1322, 22 *L.Ed.*2d 600 (1969) (recognizing the right of interstate travel); [2] *see also Rinier v. State,* 273 *N.J.Super.* 135, 142, 641 *A.*2d 276 (App.Div.), *certif. denied,* 138 *N.J.* 269, 649 *A.*2d 1288 (1994), *cert. denied,* 514 *U.S.* 1016, 115 *S.Ct.* 1358, 131 *L.Ed.*2d 216 (1995) (New Jersey requirement that married couples' filing joint federal tax return must file joint State return presented "no direct legal obstacle in the paths of persons desiring to get married" (quoting *Zablocki, supra,* 434 *U.S.* at 387, n. 12, 98 *S.Ct.* at 681 n. 12)).

We add that because defendant had no "plans to marry Mr. Baldridge" at the time of trial, the effect of the judgment provision prohibiting defendant from having contact with Baldridge in the presence of her children can again be analyzed should her plans change. Post-trial developments, such as whether Baldridge elected to undergo counselling or a parenting skills course, may have impact on the proper restrictions or limitations ordered with respect to custody at that time.[3] *Cf. Lepis v. Lepis,* 83 *N.J.* 139, 416 *A.*2d 45 (1980) (regarding alimony and support obligation).

---

[2] We need not discuss the impact of cases dealing with contested child placement and termination proceedings notwithstanding that "[t]here are few rights more fundamental in and to our society than those of parents to retain custody over and care for their children, and to rear their children as they deem appropriate." *Jordan by Jordan v. Jackson,* 15 *F.*3d 333, 342 (4th Cir.1994). *See also, e.g., In re Guardianship of J.C.,* 129 *N.J.* 1, 9–10, 608 *A.*2d 1312 (1992).

[3] Courts seek to encourage bonding with both parents because it is generally in the best interest of children. As Baldridge is not a party to this action, the court was not asked to, and could not, order him to do anything as a prerequisite to his being with the children. That is not to say, however, that defendant could not formulate such a plan, with Baldridge's consent, for incorporation into an order, so that the legitimate interests of everyone involved are adequately protected.

## II.

■ The defendant was thirty-four years of age and attending Brookdale Community College at the time of the divorce proceeding.[4] She had been employed before she was married in 1985 and prior to becoming pregnant with her first child who was born in 1987. Her youngest child started kindergarten last fall.

The trial judge's award of rehabilitative alimony, designed to "enable [the] former spouse to complete the preparation necessary for economic self-sufficiency," *Milner v. Milner,* 288 *N.J.Super.* 209, 213–14, 672 *A.*2d 206 (App.Div.1996) (quoting *Hill v. Hill,* 91 *N.J.* 506, 509, 453 *A.*2d 537 (1982)), was clearly appropriate in this case involving a relatively short marriage and a young divorcee. *Heinl v. Heinl,* 287 *N.J.Super.* 337, 346, 671 *A.*2d 147 (App.Div. 1996). The six-month award was to expire in February 1997 (six months after the judge's opinion rendered before the judgment was signed), and if defendant's attainment of economic self-sufficiency did not occur despite her good faith efforts, defendant could have applied for an extension based on the "circumstances" as they developed. *Milner, supra,* 288 *N.J.Super.* at 214–15, 672 *A.*2d 206.

■ There is some appeal to the thought that rehabilitative alimony should have been structured to permit completion of college to help defendant enter the job market more easily and at a higher income, particularly because of her parenting responsibilities for the young children at home. Defendant requested such an approach in her post-trial written submission, and it may even inure to plaintiff's long-term economic interest. However, the trial judge expressed lengthy reasons for the rehabilitative alimony award she granted, noting among other things that defendant "does not remember when she started Brookdale Community College, or how long she has been going there," "that she had not provided any information as to what type of degree she would seek," that "she has not provided any information as to how long

---

4 Defendant had also earned credits at Montclair State College.

her degree or license would take to achieve," and that defendant was interested in employment which did not necessarily require a college degree.

The judge also recognized that defendant's parenting responsibilities impacted on the length and amount of rehabilitative alimony, *see N.J.S.A.* 2A:34–23(b)(6), but concluded that defendant could go back to work (and make at least $125 per week) because "both children will be in school full time." We cannot, therefore, conclude that the limited period of rehabilitative alimony was too short. Moreover, given the husband's income and obligation to pay for the children's insurance coverage, unreimbursed medical expenses and parochial school education in addition to the court imposed child support, we find no basis to disturb the amount of rehabilitative alimony awarded. *Heinl v. Heinl, supra,* 287 *N.J.Super.* at 345, 671 *A.*2d 147 (to vacate a trial court's finding concerning alimony, we must conclude that the trial court clearly abused its discretion).

### III.

In essence, Judge Patricia Del Bueno Cleary rendered extensive findings of fact and conclusions of law to support her decision. We find no basis to disturb them.

Affirmed.