ROY B. DALTON JR., United States District Judge
This case springs from a bitter dispute between a public hospital and a healthcare conglomerate over access to facilities, insurance, and doctors in Brevard County, Florida. Stuck in the middle of these dueling entities are Plaintiffs, seven oncologists employed by the healthcare conglomerate "Health First " who previously held medical privileges at the public hospital, Parrish Medical Center ("PMC ") operated by Defendant. (Doc. 1.) But PMC denied Plaintiffs' most recent applications for reappointment of their medical privileges ("Reappointment Applications ")-not based on quality of patient care, but because Plaintiffs and Health First failed to turn over patient data PMC requested. (See Doc. 33-2, pp. 64-77.) Since losing their medical privileges, Plaintiffs haven't been able to meet with their oncology patients at PMC, even in emergency situations where PMC was the closest facility for the patient. (See Docs. S-11, S-12, S-13.)
Against this backdrop, Plaintiffs filed suit, claiming that the process PMC employed to deny the Reappointment Applications-by not offering them sufficient notice and a pre-termination hearing before an impartial decisionmaker-contravened their constitutional rights to procedural due process and breached PMC's Bylaws. (Doc. 1.) Plaintiffs then moved for a preliminary injunction to: (1) reinstate their medical privileges; (2) set aside PMC's denial of the Reappointment Applications; and (3) prohibit PMC from taking further action to deprive them of their privileges or reporting them to the National Practitioner Data Bank or agency for non-clinical matters unrelated to patient welfare. (Doc. 5 ("PI Motion ").) Taking the PI Motion under advisement, the Court held a hearing on May 15, 2018 ("Hearing "). (Docs. 24, 39, 40.) This Order follows.
I. BACKGROUND
Plaintiffs are seven well-regarded oncologists with impeccable track records of *1298 providing excellent patient care. (Doc. 1, ¶¶ 8, 9, 11.) PMC is a public hospital created to serve northern Brevard County, and is the only hospital located there. (Doc. 1, ¶¶ 3-4.) Seeking to extend their practice to encompass patients in this otherwise-inaccessible area, Plaintiffs applied for initial appointment to the medical staff, which PMC granted. (Id. ¶ 12.) PMC term limits these appointments to two years, but allows physicians to seek reappointment through a process outlined in its Bylaws. (See id. ¶ 19 (citing Doc. 1-2, § 6.4 (Bylaws Reappointment Process) ).) Since their initial appointment, Plaintiffs successfully obtained reappointment each time they applied-until now. (Id. ¶ 12.) Before turning to the process Plaintiffs received, the Court details the Bylaws' reappointment process.
A. PMC's Bylaws' Reappointment Process
Seeking reappointment entails a multi-step process thoroughly detailed in PMC's Bylaws. (See generally Doc. 1-2, §§ 6.4, 6.3-5-6.3-6.) To kick-start the process, the CEO reviews an application, which then goes to PMC's Credentials and Medical Ethics Committee ("CMEC ") followed by the Medical Executive Committee ("MEC "). (See id. ) The MEC "examine[s] the evidence of the character, professional competence, qualifications and ethical standing of the applicant" to determine whether "all the necessary qualifications" have been established and met. (Id. § 6.3-5(A)(2).) Upon review, the MEC "shall take" one of three actions on the application: (1) recommend approval; (2) recommend deferral for further consideration; or (3) issue an "adverse" recommendation, as defined in the Bylaws. (Id. §§ 6.3-5(B)(1)-(3).)
This is where the path forks. If the MEC issues a "favorable" recommendation, the application goes to the Board. (Id. § 6.3-6.) Like the MEC, the Board "shall take" one of three actions on the MEC's recommendation: (1) adopt it; (2) reject it; or (3) refer it back to the MEC for further consideration.[1] (Id. §§ 6.3-6(A)-(C).) But if the MEC's recommendation is "adverse," the "applicant shall be entitled to ... procedural rights" (id. § 6.3-5(B)(3) ),[2] that is, special notice and a hearing before an Ad Hoc Committee of the Medical Staff (id. § 9.2-1).[3] Such hearing entails a panoply of procedural rights for the applicant, including having counsel present, calling witnesses, and cross-examination. (See id. § 9.2-4(E).) Depending on the outcome of the hearing, an applicant may seek appellate review in front of the Board, who renders a final, binding decision. (See id. §§ 9.3-1-9.3-2(A).)
Beyond a hearing, the Bylaws contemplate another process if a committee "receives or is considering initiating an adverse recommendation concerning a practitioner": an interview with that committee.[4] (Id. § 9.1-1.) An interview is *1299 "preliminary in nature." (Id. ) The practitioner is "informed of the general nature of the circumstances and may present relevant information thereto," but the interview "shall not constitute a hearing" and "shall not be conducted according to the procedural rules of hearings." (Id. ) From an interview, the MEC makes a recommendation about the practitioner to the CEO, who then confers with the practitioner and the MEC before resolving the application. (Id. §§ 9.1-2-9.1.3.)
So the key actors in reappointment are the MEC and the Board. For both, the Bylaws strictly circumscribe their universe of actions-but the Board retains ultimate authority over the decision to reappoint. (See id. § 6.3-6.)
B. Plaintiffs' Reappointment Process
With their terms set to expire on January 18, 2018, Plaintiffs submitted reappointment applications in advance, as usual. (See Doc. 1, ¶ 19; Doc. 33-1, ¶ 9.) In line with the Bylaws, PMC's CEO George Miktarian, Jr. ("Miktarian ") submitted the applications to the CMEC. (Doc. 33-1, ¶ 21.) On review, the CMEC transmitted the applications to the MEC. (Id. ¶ 22.) The MEC reviewed the applications and, on November 21, 2017, provided a favorable recommendation regarding Plaintiffs' reappointment to the Board ("Favorable Recommendation "). (Id. ¶ 23.) The Board considered the Favorable Recommendation at its meeting on December 4, 2017. (Id. ¶ 25; Doc. 33-2, pp. 2-4.) There, Miktarian spoke:
Mr. Mikitarian noted that PMC hosts the only cancer program in Brevard County accredited by the Commission on Cancer. The PMC cancer program relies on clinical data from both Physicians and Hospitals. For the first time, the program's accreditation is in jeopardy, due to a number of physicians as listed not submitting the needed clinical data to maintain accreditation. Mr. Mikitarian disseminated a memorandum documenting the attempts to retrieve the information, as well as a draft letter to each physician requesting the information yet again. Discussion ensued and the following motion was made by Mr. Jordan, seconded by Dr. Galfo and approved (8 ayes, 0 nays, 0 abstentions).
(Doc. 33-2, p. 3.) On hearing this, the Board decided to "send back to MEC" the Favorable Recommendation "due to non compliance with numerous requests for clinical data" ("Board Referral "). (Id. ) It directed PMC's administration to "hand deliver and email letters to each practitioner on December 5th, providing for submission of data within 5 days, and advise MEC to provide a response by January 8, 2018."[5] (Id. at 4.) Till this point, PMC's process tracked the Bylaws. (See Doc. 1-2, §§ 6.3-5-6.3-6, 6.4.)
The MEC then met in executive session on December 19, 2017. (Doc. 33-1, pp. 31-34.) In light of the Board Referral, it discussed Plaintiffs' applications again:
Health-First Hematology/Oncology and Radiation Oncology Physicians Reappointment Referral Back to MEC
The Committee discussed the Board of Directors reappointment referral back to the MEC regarding the Health-First *1300 Hematology/Oncology and Radiation Oncology physicians. The packet of supporting documentation is appended to the file copy of these minutes. There has been non-compliance with numerous requests for clinical data for submission to the Commission on Cancer for Accreditations purposes. The following motion was made, seconded and approved (Drs. Flynn, Williams, Ochoa and Manion voted yes. Drs. Barimo and Rao voted no. Dr. Patel abstained).
ACTION TAKEN : MOTION TO SUPPORT THE BOARD OF DIRECTORS RECOMMENDATION REGARDING THE HEALTH-FIRST CANCER CENTER PHYSICIANS AND THEIR NON-COMPLIANCE REGARDING THE NUMEROUS REQUESTS FOR CLINICAL DATA FOR SUBMISSION TO THE COMMISSION ON CANCER FOR ACCREDITATION PURPOSES.
(Id. at 34.) With this, the MEC pledged allegiance to the Board if it decided to deny Plaintiffs' reappointment applications ("MEC Support Motion "). (See id. )
Miktarian then sent each Plaintiff a letter on December 29, 2017, titled "Notice of Recommended Denial of Application for Reappointment and Clinical Privileges." (Id. at 36-49 ("December 29 Letter ").) The letter informed Plaintiffs the MEC "decided to support the Board if it chooses not to renew [their] privileges," and rooted the MEC Support Motion as "authorized by Sections 6.3-5(B)(3) and 6.4-5(A)" of the Bylaws. (E.g., id. at 48 (Dr. Sprawls' letter).) Each Plaintiff was told they "may request an interview regarding this recommendation." (Id. ) As to a hearing, the letter said:
Pursuant to Sections 6.3-5(B)(3) and 9.2-3(A)(2) of the Medical staff Bylaws, if the action of the MEC set forth above is considered an adverse action pursuant to the PMC Medical Staff Bylaws Section 9.2-3(A), then you are entitled to the procedural rights set forth in Article IX. You may request a hearing before an Ad Hoc Committee of the Board of Directors pursuant to Section 9.2-1. Your request for hearing must be in writing and delivered to me within thirty (30) calendar days from your receipt of this letter. In accordance with Section 9.2-1, your failure to request a hearing within thirty (30) days shall be deemed a waiver of your right to a hearing and any appellate review.
(Id. )
Plaintiffs responded to this letter on January 9, 2018, expressing confusion at "what [the] letter attempts to convey," specifically what action had been taken so far on Plaintiffs' applications and what procedural rights were implicated. (Id. at 51-62.) Plaintiffs then pointed out the discrepancy between its title and content:
Although the reference in the letter indicates that it is a Notice of Recommended Denial for Reappointment and Clinical Privileges, the first paragraph of your letter does not indicate that the Board of Parrish Medical Center has rejected what appears to be an affirmative recommendation of the MEC to grant reappointment of membership and clinical privileges (pursuant to Section 6.3-5(b)(1) of the Medical Staff Bylaws), but rather merely indicates that if the Board does so (which would be pursuant to Section 6.3-6(B) of the Medical Staff Bylaws), the MEC would not oppose such Board determination.
(E.g., id. at 61.) They requested clarification and copies of the CMEC and MEC's recommendations for their applications, along with information on the next Board *1301 meeting and an update on the Board's actions. (Id. at 61-62.)
Between these two letters, the Board met on January 8, 2018. (Doc. 33-1, ¶ 9.) As expected, it voted not to renew Plaintiffs' medical privileges. (Id. ) Ten days later, Miktarian broke the news, sending each Plaintiff a letter titled "Notice of Denial of Application for Reappointment and Clinical Privileges." (Id. at 64-77.) As grounds, Miktarian stated that PMC was "simply protecting its business interests given the numerous requests for certain clinical data that [Plaintiffs had] not provided." (E.g., id. at 76.) Recapping Plaintiffs' reappointment process, the letter noted:
Please know that the Medical Executive Committee did affirmatively recommend renewal of your privileges (the "Clinical Recommendation"). However, the Medical Executive Committee did, also on December 19th, 2017, resolve to support the Board in a then prospective (then yet to be voted upon) Board recommendation whether to renew your privileges due to noncompliance with numerous requests for clinical data from you and your medical practice for submission to the Commission on Cancer for accreditation purposes (the "Data Recommendation"). The Board subsequently voted not to renew your privileges on the date referenced above.
The reasons for the Board recommendation are noncompliance with the Medical Staff Bylaws by your repeated failure to provide the requested clinical data. This Board recommendation is based upon such noncompliance, and not upon your clinical competence or professional conduct, nor upon conduct which affected or could have adversely affected the health or welfare of a patient or patients.
(Id. ) As to further process, the letter explained:
As you may be away, Section 9.1-1 affords an interview when "... the Medical Executive Committee (MEC), other relevant medical staff committee, or the Board or any appropriate committee thereof receives or is considering an adverse recommendation concerning a practitioner," Section 9.2-1 provides for a hearing before an Ad-Hoc hearing Committee of the Medical Staff if requested "When any practitioner receives special notice of an adverse recommendation of the MEC as defined in Section 9.2-3 ..." In this instance the recommendation towards you is from the Board (absent an adverse recommendation from the Medical Executive Committee regarding clinical competence, professional conduct, or conduct which affected or could have adversely affected the health or welfare of a patient or patients). Nonetheless, Parrish is willing to not only provide you with appellate review under Section 9.2 of the Bylaws, but also with an interview before an Ad-Hoc Committee of the Board of Directors. A copy of the Board Resolution, Clinical Recommendation, Data Recommendation, and Credentials and Medical Ethics Committee recommendation, are attached. All are redacted so as not to disclose the names of other practitioners considered in these meetings. We trust these are sufficient for you to decide whether to pursue such an interview or appeal.
(Id. ) In one fell swoop, Plaintiffs were denied reappointment and the right to a hearing, but offered an interview or appeal with members of the Board who voted to reject them. (See id. ) And since Plaintiffs' medical privileges had expired, "Sayonara!" (See id. )
*1302 So ignited a series of letters back-and-forth between Plaintiffs and Miktarian, then Plaintiffs' counsel and PMC's counsel. (Id. at 79-99; Doc. 33-3, pp. 2-28, 43-44, 46-47.) In their initial response, Plaintiffs demanded a fair hearing as outlined in the Bylaws and accepted the offered interview and appeal. (Doc. 33-2, pp. 79-99.) After Miktarian denied the hearing demand (Doc. 33-3, pp. 2-28), Plaintiffs' counsel sought confirmation that the reappointment denial could not be reported to the National Practitioner Data Bank ("Confirmation Request ")-if so, Plaintiffs would forego the interview and appeal (Id. at 43-44.) PMC's counsel responded on March 23, 2018, flatly denying the Confirmation Request while noting an issue with Dr. Sprawls' medical records for which PMC could not confirm did not implicate a reporting obligation. (See id. at 46-47.) Six days later, Plaintiffs filed suit. (Doc. 1.)
C. This Action
Plaintiffs bring this action under 42 U.S.C. § 1983 claiming PMC violated their Fourteenth Amendment right to procedural due process rights ("PDP "). (Id. ¶¶ 47-58 ("PDP Claim ").) Plaintiffs also claim that PMC breached its Bylaws by fraudulently denying their reappointment applications based on false information. (Id. ¶¶ 59-67 ("Bylaws Claim ").) They seek injunctive relief and damages for both (id. ¶¶ 47-58), and filed the PI Motion on April 5, 2018 (Doc. 5). PMC responded (Docs. 32, 33), Plaintiffs replied (Doc. 35), and the Hearing occurred (Docs. 38, 39). With this, the matter is ripe.
II. LEGAL STANDARD
A district court may issue a preliminary injunction when the movant demonstrates: (1) a substantial likelihood of success on the merits; (2) that irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest. See Four Seasons Hotels & Resorts, B.V. v. Consorcio Barr, S.A. , 320 F.3d 1205, 1210 (11th Cir. 2003) ; see also Nken v. Holder , 556 U.S. 418, 434, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009) (describing traditional elements of a stay in removal proceedings). Preliminary injunctions are "drastic" and "extraordinary" remedies, not to be issued unless the movant has "clearly established" the burden of persuasion on each element. Four Seasons , 320 F.3d at 1210 (citation omitted). They are the exception, not the rule. Id.
III. DISCUSSION
Plaintiffs seek a preliminary injunction on either claim. (See Doc. 5, pp. 13-23.) For the PDP Claim, they assert a property interest in reappointment that entitles them to adequate notice and a pre-deprivation hearing before an impartial decisionmaker. (Id. at 13-15.) For the Bylaws Claim, they profess that the Bylaws constitute an enforceable, binding contract that do not permit PMC to deny the Reappointment Applications to suit its "business interests." (Id. at 16-19.) Without medical privileges, Plaintiffs cannot treat their patients at PMC; such "irreparable harm" has already impacted patients in need of critical care and their families. (Id. at 19-20; see also Docs. S-11-S-13.) In light of the services Plaintiffs provide, they contend that balance of hardships favors them, not PMC; and that injunctive relief would not be adverse to public interest here, but actually favors it. (Id. at 21-22.) Should the Court grant injunctive relief, Plaintiffs request a nominal bond. (Id. at 23.)
*1303 PMC opposes at each step of the way, maintaining that Plaintiffs dug their own graves by failing to provide the requested data. (See Doc. 32, p. 2.) Contesting the PDP Claim, PMC avers its process hewed to the Bylaws, which grant the Board "ultimate authority to make decisions regarding physician privileges." (Id. at 10.) As to the Bylaws Claim, PMC invokes immunity under Florida law. (Id. at 19-20.) And for the other factors, PMC points out that since joining Health First, Plaintiffs' patient admission rates have plummeted-so not many "critically ill cancer patients" are affected by Plaintiffs' absence. (See id. at 17-20.) Should injunctive relief issue, PMC seeks a substantial bond-"in excess of $7,000,000"-from Plaintiffs. (Id. at 20.)
On review, the Court finds that Plaintiffs have met their burden for a preliminary injunction on the PDP Claim. Ergo, the Bylaws Claim will not be addressed at this time. The Court takes each PI factor in turn.
A. Likelihood of Success on the Merits
PDP applies "only to the deprivation of interests encompassed by the Fourteenth Amendment's protection of liberty and property." Bd. of Regents of State Colleges v. Roth , 408 U.S. 564, 569, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972). "When protected interests are implicated, the right to some kind of prior hearing is paramount." Id. at 569-70, 92 S.Ct. 2701. If a property interest is at stake, the PDP inquiry breaks down into two steps: (1) is there a property interest; and (2) if so, what process is due? See id. at 577, 92 S.Ct. 2701 ; see also Cleveland Bd. of Educ. v. Loudermill , 470 U.S. 532, 542, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) ; Mathews v. Eldridge , 424 U.S. 319, 332-35, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).
1. Is there a Property Interest?
For the first step, a property interest is defined as "a legitimate claim of entitlement" ("LCE "). Roth , 408 U.S. at 577, 92 S.Ct. 2701. This is "more than an abstract need or desire," and "more than a unilateral expectation" of the benefit at stake. Id. Rather, LCEs "are created and their dimensions [ ] defined by existing rules or understandings that stem from an independent source such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to these benefits." Id. (emphasis added).
In the re-employment context, the LCE inquiry looks at whether state law, administrative standards, rules, policies, contracts, or something of the sort "secured" the interest in re-employment or "created any legitimate claim to it." Id. at 578, 92 S.Ct. 2701. As applied to medical privileges, this means the physician's employment agreement and/or the hospital's bylaws. See Ne. Ga. Radiological Ass., P.C. v. Tidwell , 670 F.2d 507, 510-11 (5th Cir. 1982) ;[6] Shahawy v. Harrison , 875 F.2d 1529, 1532 (11th Cir. 1989). For example, if bylaws "detail the procedure to be followed when corrective again against a medical staff physician is warranted," specifically by outlining "[n]otice and hearing," and "appellate review," then medical staff privileges constitute "a protected property interest." Tidwell , 670 F.2d at 511. Similarly, "a constitutionally-protected *1304 property interest in medical staff privileges" arises when "the medical staff bylaws establish specific standards and procedures to be applied when considering the suspension, denial, or revocation of the staff privileges of any member." Shahawy , 875 F.2d at 1532.
Here, PMC's Bylaws outline specific standards and procedures to apply when a physician seeks reappointment of medical privileges. (See supra Pt. I.A. (citing Doc. 1-2, §§ 6.4, 6.3-5, 6.3-6).) This includes procedures for the initial application, CMEC review, MEC review, and the Board's decision. (See id. ) From these procedures alone, applying Shahawy , it is fair to say that a constitutionally protected property interest arises here. See 875 F.2d at 1532. But the Bylaws don't stop there. Rather, when the MEC recommends denial of reappointment , the Bylaws entitle a physician-pre-expiration of privileges-to special notice, a hearing, and appellate review. (Doc. 1-2, §§ 9.2-1; 9.2-3(A)(2), (B)(1).) So like Tidwell , the Bylaws contemplate "procedural due process prior to the [denial of a reappointment application] of staff privileges," thereby "sustain[ing Plaintiffs'] claim to a protected property interest." See 670 F.2d at 511.
2. What Process Is Due?
As Plaintiffs have a protected property interest in reappointment, the inquiry turns to what process is due. See id. ; see also Shahawy , 875 F.2d at 1532. "A fundamental principle of procedural due process is that a person be given a pre-termination hearing prior to being deprived of any significant property interest." Shahawy , 875 F.2d at 1533 (citing Boddie v. Connecticut , 401 U.S. 371, 379, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971) ). "Medical staff privileges embody such a valuable property interest that notice and hearing should be held prior to its termination or withdrawal, absent some extraordinary situation where a valid government or medical interest is at stake." Tidwell , 670 F.2d at 511.
How extensive the hearing need be depends on "a balancing of competing interests." Shahawy , 875 F.2d at 1533 ; see also Boddie , 401 U.S. at 378, 91 S.Ct. 780 ("The formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings."). In Shahawy , the physician was afforded "the full panoply of due process protections"-including notice, representation by counsel, and cross-examination-procedure "[t]hat comports with the broadest notions of [PDP]." 875 F.2d at 1533.
On the flip side of that coin, in Woodbury v. McKinnon , the former Fifth Circuit found that a physician received due process when his surgical privileges were terminated following a "hearing [that] was an informal discussion by the medical staff of the cases specified in the charges against [him]." 447 F.2d 839, 844 (5th Cir. 1971). Before the hearing, the physician received "specific" notice "to permit [him] to answer the charges." Id. At the hearing, the physician's attorney was present and could "confer at will" with him, but only the physician could ask questions and engage the medical staff. Id. Based on the nature of the charges and the hearing, no witnesses were presented and no other doctors testified, so no cross-examination occurred. Id. Overall, "the hearing was held in a decorous manner with a high degree of professionalism," and the medical staff acted without bias in reaching its decision. Id. at 845.
Here, Plaintiffs were denied due process for their Reappointment Applications. Before *1305 depriving Plaintiffs of their property interest in reappointment, PMC needed to provide them the opportunity for a pre-expiration hearing before an ad hoc committee of the medical staff-a neutral decider. See Tidwell , 670 F.2d at 511. Indeed, the Bylaws mandate such hearing when the MEC recommends denying reappointment. (See also Doc. 1-2, §§ 9.2-1, 9.2.2.) So when the MEC issued its Support Motion and PMC sent Plaintiffs "notice of recommended denial of applications for reappointment and clinical privileges," Plaintiffs' procedural right to a hearing as tendered in the Bylaws was triggered.[7] (Doc. 1-2, pp. 36-49 (December 29 Letter).) Anything short of this violated Plaintiffs' PDP.
Instead, post-expiration, PMC offered Plaintiffs an interview and appellate review in front of the Board-the same individuals who denied Plaintiffs' Reappointment Applications.[8] (See Doc. 33-1, pp. 64-77.) Not good enough. As PMC's Counsel attested to at the Hearing, the decision to deny Plaintiffs' reappointment based on their failure to provide data had a "nexus" with "the delivery of quality health care," (Doc. 40, p. 65: 17-19) so properly should have been considered by the MEC after the Board Referral and led to an affirmative recommendation-not just a support motion (see Doc. 1-2, §§ 6.3-5(A)(2), (B)(1)-(3) ). Had this happened, the Court likely would not be here.
But that's the rub of the green. Because PMC failed to provide Plaintiffs a hearing in line with the Bylaws, Plaintiffs have established a substantial likelihood of success on the merits of their PDP Claim. So *1306 the Court turns to the remaining PI factors.
B. Irreparable Injury
The next factor is irreparable injury, the "sine qua non of injunctive relief." Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville , 896 F.2d 1283, 1285 (11th Cir. 1990) (quotation marks and quotation omitted). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." Id. "The injury must be neither remote nor speculative, but actual and imminent." Id. (quotation omitted). "The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." Id. (quoting Sampson v. Murray , 415 U.S. 61, 88, 94 S.Ct. 937, 39 L.Ed.2d 166 (1974) ).
Here, Plaintiffs propound that irreparable harm will result absent injunctive relief based on their inability to care for their patients at PMC. (Doc. 5, pp. 19-20.) As support, Plaintiffs submit three affidavits. (Docs. S-11, S-12, S-13.) The first was from a cancer patient of Dr. Dalal undergoing aggressive chemotherapy with severe side effects that required immediate, emergency treatment after Dr. Dalal was ousted from PMC. (S-11, ¶¶ 7-11.) So to meet with Dr. Dalal, whom the patient deemed "critical to [his] treatment" as opposed to "a doctor who was not involved and familiar with [his] previous history and current treatment," the patient "had to drive over forty-five minutes ... to a facility where Dr. Dalal could see [him]." (Id. ¶ 11.)
The other affidavits relate to a patient of Dr. Prendergast diagnosed with lung cancer. (S-12, ¶ 6.) After Dr. Prendergast's reappointment was denied, his patient "became ill with a severe headache that rendered [him] unresponsive" for more than a day. (Id. ¶¶ 7-8.) He was transported to PMC's emergency room for treatment, where his wife informed the staff that Drs. Prendergast and Muwalla were treating him. (Doc. S-13, ¶¶ 4, 6.) PMC ignored this information-"at no time did the medical staff call his doctors ... or otherwise consult [them]." (Id. ¶ 6.) Instead, the patient was transported by ambulance to the Mayo Clinic in Jacksonville, 132 miles away, "because [PMC] was unable to provide care for his condition." (Id. ¶¶ 7, 8.) During this ordeal, the staff did not offer or discuss "any other testing or treatment options available closer ... or with [his] doctors" (id. ), but the patient later learned "there were several other locations in and around Brevard County that could have provided ... the very same testing and recommended treatment." (Doc. S-12, ¶ 14). It turned out that the patient "had several cancerous tumors in [his] brain that would require a 10-day course of whole brain radiation therapy." (Id. ) Yet the Mayo Clinic was only planning on administering a 5-day therapy. (Id. ) On hearing this, the patient insisted on speaking with Dr. Prendergast so he could undergo the full 10-day course of treatment with him. (Id. ¶¶ 11-13.) Of course, this treatment is not possible at PMC anymore. (Id. ¶ 15.)
Beyond this evidence of irreparable harm to their patients, Plaintiffs point to the loss of valuable goodwill resulting from their discharge (id. at 20-21), and the "death [knell]" of "being reported to the National Practitioner Data Bank" (Doc. 40, p. 22: 24-25.) PMC responded by contesting Plaintiffs' claim for loss of goodwill (Doc. 32, p. 18), but refused to confirm that *1307 the discharge was non-reportable (id. ; Doc. 40, pp. 59: 17-18). Notably, PMC did not dispute that Plaintiffs can no longer treat their cancer patients there and instead focused on Plaintiffs' low admissions numbers since being employed by Health First. (Doc. 32, pp. 17-18.)
On review, the Court finds that Plaintiffs have met their burden of showing irreparable injury that cannot be monetized. See Ne. Fla. Chapter , 896 F.2d at 1285. First, denying Plaintiffs' Reappointment Applications caused and continues to cause irreparable injury to Plaintiffs' critically ill cancer patients who have not and cannot receive the same type of care as before. Maintaining the relationship between a patient and treating physician is of paramount concern and cannot be taken lightly. PMC's apparent indifference to patient well-being as weighed against protection of their own business interest leaves the Court nonplussed. No further degradation of care for these patients will be tolerated, and this alone constitutes "irreparable injury." Yet the Court is also troubled by PMC's dogged refusal to confirm whether Plaintiffs' denial constitutes a reportable event to the National Practitioner Data Bank. (See Doc. 40, pp. 58: 23-25, 59: 1-25, 60:1-12.) Hedging is unacceptable, since such reporting implicates Plaintiffs' right to practice and cannot be monetized. Therefore, coupling the injury to Plaintiffs' patients with the Data Bank reporting, the Court finds that irreparable harm exists to support injunctive relief.
C. Additional Factors
For the remaining factors, the Court finds that the irreparable harm here outweighs any potential monetary damage PMC would suffer, and that narrowly tailored injunctive relief serves the public interest. See Four Seasons , 320 F.3d at 1210. To that end, the Court directs PMC to reinstate Plaintiffs' medical privileges to allow them the opportunity for an impartial hearing as contemplated in the Bylaws before the MEC on the issue of whether Plaintiffs' inability or refusal to turn over Health First's data deserves the guillotine. The reinstatement will last for a limited period, or until the hearing, whichever expires first. Pending the hearing, PMC shall not report Plaintiffs to the National Practitioner Data Bank. And should Plaintiffs elect no hearing or the hearing outcome is adverse, the injunction expires.
D. Bond
Issuing a preliminary injunction requires the moving party to post an adequate bond. Fed. R. Civ. P. 65(c). On review, the Court finds that additional briefing is necessary to determine the requisite amount here, so will hold off on that for now.
IV. CONCLUSION
Accordingly, it is ORDERED AND ADJUDGED that:
1. Plaintiffs' Motion for Preliminary Injunctive Relief and Incorporated Memorandum of Law (Doc. 5) is GRANTED IN PART :
a. PMC is ORDERED to provide Plaintiffs the opportunity for a hearing in conformity with its Bylaws Section 9.2 within sixty (60) days of this Order.
b. PMC is directed to immediately REINSTATE Plaintiffs' privileges pending the outcome of the hearing, or for sixty (60) days, whichever comes first.
c. PMC is ORDERED not to report Plaintiffs to the National Practitioner *1308 Data Bank pending the outcome of the hearing, or for sixty (60) days, whichever comes first.
d. If the hearing outcome is adverse or Plaintiffs elect no hearing, this injunction EXPIRES .
e. In all other respects, the PI Motion is DENIED .
2. On or before Monday, June 11, 2018 , Plaintiffs and PMC are DIRECTED to submit briefing not to exceed five (5) pages on the amount of bond the Court should require.
DONE AND ORDERED in Chambers in Orlando, Florida, on June 6, 2018.

(See also Doc. 1-2 §§ 9.2-3(A), (B)(1) (defining certain recommendations as "adverse" if "recommended by the MEC").)

If the Board refers an application back, the MEC's recommendation options remain the same as its initial round of review: approval, deferral, or issuing or issuing an "adverse" recommendation. (See id. § 6.3-5(B).)

Likewise, if the Board's rejection of the MEC's favorable decision is considered "adverse," an applicant is entitled to these procedural rights. (Id. § 6.3-6(B).)

Beyond an interview, hearing, and appellate review, the Bylaws also offer "alternative board action" and "conflict resolution" as additional processes. (Id. §§ 9.3-3-9.3-4.)

These letters were sent to Plaintiffs (Doc. 33-2, pp. 16-29), who responded on December 8, 2017 (Doc. 33-3, pp. 30-33).

The decisions of the former Fifth Circuit rendered before October 1, 1981 are binding on this circuit. Bonner v. City of Prichard , 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Under the Bylaws, the MEC had three recommendation options when the Board referred the Favorable Recommendation back to them: approve, deny, or defer. (See Doc. 1-2, § 6.3-5(B)(1)-(3).) Tacitly approving an upcoming decision to deny reappointment equals an "adverse" MEC recommendation of "denial of reappointment" that triggers a right to a hearing (see id. §§ 6.3-5(B)(3), 9.2-3(A)(2), (B)(1) )-which PMC admitted in its December 29 letter notifying Plaintiffs of the MEC's "Recommended Denial" by labeling the MEC Support Motion an "action ... authorized by Sections 6.3-5(B)(3) and 6.4-5(A)" of the Bylaws" (Doc. 33-1, p. 36.) That PMC equivocated by later calling the MEC Support Motion a "resolve to support the Board" rather than "an adverse recommendation from the [MEC]" does not change the Court's analysis. (See id. at 64-65 (January 18 Letter).) Evaluating Plaintiffs' Reappointment Applications was a single, ongoing process, and PMC cannot shirk its obligation to follow the Bylaws by claiming the review devolved into separate stages following the Favorable Recommendation and the MEC Support Motion.

The December 29 Letter does not change things. (See Doc. 33-1, pp. 36-49.) There, PMC informed Plaintiffs of the MEC Support Motion, first stating they "may request an interview regarding this recommendation," but then saying that if the MEC Support Motion "is considered an adverse action, ... then you are entitled to the procedural rights set forth in Article IX." Well, if so, Plaintiffs should have received a hearing presided over by an ad hoc committee of the medical staff. (See Doc. 2-1, § 9.2-1 ("When any practitioner receives special notice of an adverse recommendation of the MEC as defined in Section 9.2-3, he shall be entitled, upon request, to a hearing before an Ad Hoc hearing Committee of the Medical Staff .") (emphasis added).) But PMC did not offer this. Instead, the letter says, "You may request a hearing before an Ad Hoc Committee of the Board of Directors pursuant to Section 9.2-1 ." (Doc. 33-1, p. 36 (emphasis added).) Putting aside PMC's erroneous citation of its own Bylaws, neither process mentioned here safeguards Plaintiffs' due process rights. What is missing is a neutral decisionmaker evaluating whether Plaintiffs should be reappointed-and under the Bylaws, that decisionmaker is an Ad Hoc Committee composed of medical staff. (See Doc. 1-2, § 9.2.2.)