**[Cite as *In re Adoption of U.I.*, 2024-Ohio-682.]**

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | |
|---|---|
| IN THE MATTER OF THE ADOPTION OF U.I. AND N.M. | : |
| | : |
| | : C.A. No. 29908 |
| | : |
| | : Trial Court Case Nos. 2023 ADP 00028; 2023 ADP 00029 |
| | : |
| | : (Appeal from Common Pleas Court-Probate Division) |
| | : |
| | : |

. . . . . . . . . . .

O P I N I O N

Rendered on February 23, 2024

. . . . . . . . . . .

ANDREA M. SEIELSTAD, Attorney for Appellant

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Petitioner-Appellant appeals from judgments of the Montgomery County probate court dismissing her petitions to adopt her grandchildren, U.I. and N.M.[1]  For the following reasons, we will reverse the judgments of the probate court and remand the matters for further proceedings consistent with this opinion.

---

[1] We refer to the grandchildren by their initials.

I.      Facts and Course of Proceedings

**{¶ 2}** On March 24, 2023, Appellant filed petitions in the Montgomery County probate court to adopt her grandchildren, U.I. and N.M. Montgomery P.C. Nos. 2023 ADP 28 and 2023 ADP 29. In an addendum to her petitions, Appellant explained that she was the maternal grandmother of the minor children and had been their sole primary caretaker for the last seven years. Appellant stated that U.I. had been born in the Democratic Republic of Congo ("DRC") and N.M. had been born in a refugee camp in Uganda. The mother of the children had died in the refugee camp in Uganda shortly after giving birth to N.M. The father of the children had been killed in a mass killing in the DRC. On November 3, 2016, the children and Appellant were granted entry into the United States as refugees under the Immigration and Nationality Act. Appellant and the children lawfully immigrated to Texas in 2016 and moved to Dayton, Ohio, in 2019. Appellant is the closest surviving relative of the children. Appellant sought the adoptions so that she would have the legal authority to function as the children's guardian and to make medical decisions for the children and so that the children would automatically become naturalized United States citizens when Appellant becomes a naturalized citizen.

**{¶ 3}** Along with her petitions, Appellant filed a motion for the waiver of filing fees and court costs pursuant to R.C. 2323.311 due to her status as an indigent person. Appellant also submitted an affidavit of indigency. The probate court held a hearing on Appellant's motion for waiver of fees and court costs. At this April 13, 2023 hearing, Appellant testified as to her current employment, hourly wage, yearly earnings, monthly

expenses, and amount of savings. Appellant also testified that her insurance was through Medicaid and that she received food stamps for her and her grandchildren.

{¶ 4} On April 20, 2023, the probate court granted Appellant's motion for waiver of fees based on its finding that Appellant qualified as indigent under both of the requirements in R.C. 2323.311. Consequently, the probate court stated that the two adoption petitions would proceed without initial deposits for costs normally required of a petitioner. However, the court noted that there would be costs to the petitioner as are typically charged to adoption petitioners in the probate court. The court explained that, although it was willing to waive the initial filing fees, it was not willing to waive all fees, costs, and expenses associated with the two adoption filings. The court then stated:

> In a case like the two adoption petitions now before this Court, however, there is no monetary judgment being sought, thus there will be no amount from which the clerk may recoup the fees that are waived. Thus, in this situation, it appears that Petitioner is asking that the Court, rather than the Petitioner, bear the cost of the litigation. This presents a potential budgetary problem for this Court and Board of County Commissioners, given the appropriation and annual budget constraints. In other words, this Court does not have unlimited resources to assist litigants, no matter how altruistic the case.

> This Court is well-aware of Petitioner's status and situation in trying to raise two children on a limited income and with limited resources. This Court is sympathetic but must maintain a budget and Petitioner's filing(s)

trigger broader policy implications in this Court. As always, the Second District Court of Appeals is presumably available to provide guidance. * * *

Decision Granting Motion for Waiver of Fees (Apr. 20, 2023), p. 4.

{¶ 5} Less than two months later, on June 13, 2023, the probate court issued an order to show cause why the adoption petitions should not be dismissed for lack of prosecution due to Appellant's failure to keep costs current. According to the probate court, $36.00 was owed on each case for a total of $72.00. The probate court ordered Appellant "to show cause why costs are not current and other paperwork filed, on or before July 10, 2023, or the matter may be dismissed." The probate court did not identify what "other paperwork" needed to be filed.

{¶ 6} On June 23, 2023, Appellant filed a response to the show cause order. According to Appellant, she and her counsel were unaware that any costs had been assessed and were owed to the court until they received the show cause order. She stated that she and her counsel were not aware "that a specific amount was yet due or that continuing to the scheduling order and next stages of the case were conditional on the payment of $72 (or any amount yet assessed)." Appellant requested that the probate court waive the $72 in total costs referenced in the court's show cause order. In the event the probate court would not waive the costs, Appellant stated that her attorneys would "contact the court about how to rectify the $72 now claimed by the court."

{¶ 7} On August 14, 2023, the probate court dismissed both petitions for adoption. According to the probate court, it had "previously expressed its concern that it might not have jurisdiction to consider the proposed adoption of the minors in these two cases, due

to the minors being citizens of a foreign country and no records of their home country allowing the adoption." Decision Dismissing Petitions for Lack of Jurisdiction (Aug. 14, 2023), p. 1. The probate court found that Appellant had not provided the court with any documentation that the requirements of 42 U.S.C. 14931 had been met. The probate court explained that it did not have the authority to override this federal requirement. Also, the probate court relied on a paragraph from the U.S. Department of State's website that informed the public in 2020 that adoptions from the DRC were being suspended. Based on this, the probate court concluded that it lacked subject-matter jurisdiction to address the adoption petitions before it. Further, the probate court found that Appellant had not adequately addressed the June 13, 2023 show cause order. Although the court noted that it had agreed to waive the initial filing fee for each adoption petition due to Appellant's indigency, the court was not willing "to go so far as to provide a blank check for all services it offers." *Id.* at 9. Therefore, the probate court also dismissed the adoption petitions on the basis of Appellant's failure to pay the court costs of $72.00.

{¶ 8} Appellant timely appeals from the probate court's decision.

II. The Probate Court Erred in Dismissing the Adoption Petitions Due to a Lack of Subject-Matter Jurisdiction

{¶ 9} The first assignment of error states:

The Trial Court Erred in Dismissing the Adoption Petitions for Lack of Subject Matter Jurisdiction Based Upon Its Understanding of the Hague Convention on Protection of Children and Co-operation in Respect of

Intercountry Adoption and related guidance from the Department of State regarding the Democratic Republic of Congo.

**{¶ 10}** A trial court's dismissal of a claim for lack of subject-matter jurisdiction is a question of law, which we review de novo. *NVR, Inc. v. Centerville*, 2016-Ohio-6960, 71 N.E.3d 745, ¶ 20 (2d Dist.). Before addressing the merits of Appellant's arguments on appeal, however, we must note that the record does not reflect that Appellant was given any notice that the probate court was considering dismissing the adoption petitions based on a lack of subject-matter jurisdiction. Rather, the probate court previously had only mentioned the failure to advance costs as the reason the case may be dismissed. Order to Show Cause (June 13, 2023). We acknowledge that Civ.R. 12(H)(3) does not require notice before a case is dismissed for lack of subject-matter jurisdiction. However, we believe the better practice is for trial courts to give notice whenever possible when they are considering dismissing a case for lack of subject-matter jurisdiction. Our justice system typically works best when a trial court has the benefit of hearing from the parties before it dismisses a case sua sponte.

**{¶ 11}** The probate court found that it was bound by the restrictions of the Hague Convention on the Protection of Children and Co-operation in Response to Intercountry Adoption ("Hague Adoption Convention"), to which the United States is a party. Decision (Aug. 14, 2023), p. 3. According to the court, the Hague Adoption Convention establishes international standards of practices for intercountry adoptions and "applies to all adoptions by U.S. citizens habitually resident in the United States of children habitually resident in any country outside of the United States that is a party to the Convention."

*Id.*, citing the U.S. State Department's website. The probate court then went on to explain that although the minors involved in the two adoption petitions before it originated from a country (the DRC) that is not a member of or signatory to the Hague Adoption Convention, "adoption of minors from the DRC cannot be legally accomplished at present." *Id.* at 4, citing the U.S. State Department's website. The court concluded that it lacked subject-matter jurisdiction to approve the adoption petitions before it, because:

Petitioner in these cases has not provided the Court with any documentation indicating that the requirements of 42 USCS § 14931 have been met. Next, from the State Department's 2020 statement suspending adoptions from the Democratic Republic of the Congo, it does not appear that there is any possibility that those requirements can be met. Thus, the Court concludes that it does not have subject matter jurisdiction to approve the adoption petitions in these cases.

*Id.*

**{¶ 12}** Appellant contends that "[t]he trial court erred in determining that the Hague Adoption Convention applies to the adoption petition, as Appellant and the children are lawful permanent residents of the United States and never have been citizens of a signatory country of that Convention." Appellant's Brief, p. 7. Appellant also argues that the probate court should not have relied on the 2020 guidance from the U.S. State Department's website announcing that intercountry adoptions from the DRC were not legally possible at that time, because the adoptions at issue in this appeal do not involve intercountry adoptions. *Id.* at 10-11.

{¶ 13} In order to determine whether the probate court had subject-matter jurisdiction over Appellant's adoption petitions, we must start with an analysis of the probate court's jurisdiction in adoption cases. "It is well established that the original and exclusive jurisdiction over adoption proceedings is vested in the probate court." *In re Adoption of Pushcar*, 110 Ohio St.3d 332, 2006-Ohio-4572, 853 N.E.2d 647, citing *State ex rel. Portage Cty. Welfare Dept. v. Summers*, 38 Ohio St.2d 144, 311 N.E.2d 6 (1974), paragraph two of the syllabus. *See also* R.C. 3107.01. Generally, in Ohio, any minor may be adopted, and an unmarried adult may adopt. R.C. 3107.02(A); R.C. 3107.03(B). The petition for adoption shall be filed in the county in which the person to be adopted was born, or in which, at the time of filing the petition, the petitioner or the person to be adopted resides. R.C. 3107.04.

{¶ 14} Appellant meets the general requirements of residing in Montgomery County and being an unmarried adult. Also, the two children are minors who reside in Montgomery County. Therefore, under Ohio law, the probate court of Montgomery County presumably had subject-matter jurisdiction to address Appellant's adoption petitions. But the probate court looked outside Ohio law to determine if any federal laws precluded the probate court from considering Appellant's adoption petitions. That was understandable given the somewhat novel situation before it in which neither Appellant nor her grandchildren were citizens of the United States.

{¶ 15} In order to determine whether the probate court erred in dismissing this case based on federal law, it is important to understand the immigration status of Appellant and her grandchildren. Appellant and her grandchildren are lawful permanent residents.

Pursuant to 8 U.S.C. 1101(a)(20), "lawfully admitted for permanent residence" means "the status of having been lawfully accorded the privilege of residing permanently in the United States as an immigrant in accordance with the immigration laws, such status not having changed." The U.S. Department of Homeland Security's website explains that lawful permanent residents ("LPRs"), also known as "green card" holders, are non-citizens who are lawfully authorized to live permanently within the United States.[2] In this particular case, Appellant and her grandchildren achieved LPR status after immigrating to the United States as refugees. 8 U.S.C. 1101 et seq.; 8 C.F.R. 207.1 et seq. These children did not immigrate to the United States for the purpose of being adopted by a United States citizen pursuant to the Hague Adoption Convention or United States immigration laws. Only after being in the United States for several years as LPRs did Appellant then seek to adopt her grandchildren.

{¶ 16} Given Appellant's and her grandchildren's status as LPRs who immigrated to the United States as refugees, we do not believe the probate court was correct when it dismissed Appellant's two adoption petitions for lack of subject-matter jurisdiction. Contrary to the probate court's findings, Appellant's adoption petitions did not involve intercountry adoptions and did not involve a citizen of a country that is a signatory to the Hague Adoption Convention. Rather, the adoptions involve a lawful permanent resident of the United States (i.e., Appellant) attempting to adopt her two grandchildren, who also are lawful permanent residents in the United States. Although Appellant and her grandchildren are still considered citizens of the DRC, the adoption petitions do not

---

[2] *See* https://www.dhs.gov/ohss/topics/immigration/lawful-permanent-residents (accessed Feb. 1, 2024).

involve a citizen of one country trying to adopt a citizen of another country. Therefore, the guidance from the State Department's website and the Hague Adoption Convention cited by the probate court does not apply to or preclude Appellant's adoption petitions. *See* 42 U.S.C. 14931.

{¶ 17} This conclusion is further buttressed by an analysis of why there is a process in place relating to intercountry adoptions. "The Hague Convention on Protection of Children and Co-operation in Respect of Intercountry Adoption (Hague Adoption Convention) is an international treaty that provides important safeguards to protect the best interests of children, birth parents, and adoptive parents who are involved in intercountry adoptions." (Citation omitted.) *Stoll v. U.S. Citizenship & Immigration Servs.*, E.D. Cal. No. 1:20-cv-666-BAM, 2021 WL 780309, * 4 (Mar. 1, 2021). "A Hague Convention adoption is one, on or after the Convention effective date, where the child, habitually resident in a convention country, will move, or has moved, from one Convention country to another for purposes of adoption." *Id.* at 5, citing 8 C.F.R. 204.303. As we noted, Appellant's grandchildren did not immigrate to the United States for the purpose of being adopted. Rather, they and Appellant immigrated to the United States as refugees.

{¶ 18} Although the laws regarding intercountry adoptions do not apply to Appellant's petitions, the issue becomes whether LPRs have the right to adopt within Ohio's court system. Our review of the rights and responsibilities of LPRs reveals that they do. Information contained on the official website of the United States Citizenship and Immigration Services ("USCIS," f/k/a INS) explains that LPRs have the right to (1)

live permanently in the United States provided they do not commit any actions that would make them removable under immigration law; (2) work in the United States at any legal work of their qualification and choosing (other than jobs that are limited to U.S. citizens for security reasons); and (3) be protected by all laws of the United States, their state of residence, and local jurisdictions. This website also identifies the following responsibilities of LPRs: (1) obey all laws of the United States and localities; (2) file income tax returns and report income to the U.S. Internal Revenue Service and state taxing authorities; (3) support the democratic form of government (although LPR's cannot vote in federal, state, and local elections); and (4) register with the Selective Service if the LPR is male and age 18 through 25.[3]

{¶ 19} The USCIS also issues a handbook entitled "Welcome to the United States: A Guide for New Immigrants."[4] The USCIS lists the responsibilities and rights of LPRs in this handbook. *Id.* at p. 14. The rights include (1) living permanently anywhere in the United States; (2) working in the United States; (3) owning property in the United States; (4) attending public school; (5) applying for a driver's license in one's state or territory; (6) joining certain branches of the armed forces; (7) receiving Social Security, Supplemental Security Income, and Medicare benefits, if eligible; (8) applying to become a U.S. citizen once eligible; (9) requesting visas for one's spouse and unmarried children to live in the United States; and (10) leaving and returning to the United States under certain

---

[3] *See* https://www.uscis.gov/green-card/after-we-grant-your-green-card/rights-and-responsibilities-of-a-green-card-holder-permanent-resident (accessed Feb. 1, 2024).

[4] https://www.uscis.gov/sites/default/files/document/guides/M-618.pdf (accessed Feb. 1, 2024).

conditions. The handbook lists the following responsibilities of LPRs: (1) obey all federal, state, and local laws; (2) pay federal, state, and local income taxes; (3) register with the Selective Service if a male between the ages of 18 and 25; (4) maintain their immigration status; (5) carry proof of their permanent residence at all times; and (6) change their address online or provide it in writing to USCIS within 10 days of each time they move.

{¶ 20} In sum, other than not being allowed to vote in elections, LPRs enjoy most of the same rights and have most of the same responsibilities that United States citizens have. One of those rights is the right to seek relief in our judicial system. So, the question then is whether any federal law precludes Appellant from seeking to adopt her grandchildren in Ohio's judicial system. We believe the answer is no.

{¶ 21} The sole bases relied on by the probate court to find it lacked subject-matter jurisdiction were the Hague Adoption Convention's requirements for intercountry adoptions involving signatory members and a paragraph from the State Department's website that applied to intercountry adoptions from the DRC. But as we explained above, Appellant's adoption petitions do not involve intercountry adoptions, and the DRC is not a signatory to the Hague Adoption Convention. Further, we are not aware of any federal law that precludes an LPR from adopting another LPR in state courts within the United States. Instead, we found the following guidance on the U.S. Department of State's website: "In most cases, U.S. lawful permanent residents (LPRs) who adopt children in the United States do so under domestic state adoption laws. Domestic adoption in the United States is governed by state law. * * * However, an adoption

alone will not convey any U.S. immigration status to a child."[5] The website then goes on to distinguish this situation from an adoption of a child who is not an LPR: "LPRs who wish to adopt a specific child, who is living in the United States, but who is NOT already a U.S. citizen or U.S. lawful permanent resident, should visit the USCIS website for more information and consider consulting an attorney who specializes in immigration law and intercountry adoptions." *Id.*[6]

{¶ 22} Based on the record before us, we must conclude that the probate court erred in dismissing Appellant's petitions for adoption due to a lack of subject-matter jurisdiction. The first assignment of error is sustained.

III. The Second Assignment of Error is Overruled as Moot

{¶ 23} The second assignment of error states:

The Trial Court erred insofar as it essentially created a new classification of immigrant status; in doing so, it exceeded its lawful authority and violated the equal protection rights of the parties.

{¶ 24} Based on our disposition of the first assignment of error, this assignment of error is overruled as moot. App.R. 12(A)(1)(c).

---

[5] *See* https://travel.state.gov/content/travel/en/Intercountry-Adoption/Adoption-Process/before-you-adopt/adoption-by-non-us-citizens-living-in-us.html (accessed Feb. 1, 2024).

[6] We note that the information provided on the websites of the U.S. State Department and the USCIS is accompanied by disclaimers that the provided information is intended as a general overview and is not a substitute for the Immigration and Nationality Act and its implementing regulations. But we have not found anything in that Act and its implementing regulations that is inconsistent with the statements we have quoted in this opinion.

IV.     The Probate Court Erred In Dismissing Appellant's Adoption Petitions Based

Solely on Her Failure to Advance Court Costs and Fees

**{¶ 25}** The third assignment of error states:

The Trial Court Erred in Assessing Fees and Court Costs Despite

Appellant's Status as an Indigent Litigant Under R.C. 2323.311.

**{¶ 26}** This assignment of error concerns the probate court's decision to dismiss Appellant's adoption petitions due to Appellant's failure to pay court costs prior to the conclusion of her adoption cases.   In its June 13, 2023 show cause order, the probate court ordered Appellant to show cause why the petitions should not be dismissed due to lack of prosecution.   Then, in its August 14, 2023 decision dismissing the petitions, the court stated that Appellant had failed to adequately address the show cause order because she failed to pay costs as they were incurred.   Appellant contends that the probate court erred in determining that she was required to pay court costs and fees to proceed with the adoption of her two grandchildren despite conclusively finding that she was an indigent litigant under R.C. 2323.311.   Appellant's Brief, p. 17.   Further, Appellant argues that even where a court assesses costs throughout the pendency of the action, the appropriate point of requiring the costs to be paid is at the conclusion of the case.   *Id.* at 19.   Finally, Appellant states that constitutional implications of due process and equal protection require the probate court to waive all costs in adoption proceedings. *Id.* at 21-22.

**{¶ 27}** The probate court's dismissal for failure to prosecute is governed by Civ.R.

41(B)(1), which provides that "[w]here the plaintiff fails to prosecute, * * * the court upon motion of a defendant or on its own motion may, after notice to the plaintiff's counsel, dismiss an action or claim." A dismissal for failure to prosecute "operates as an adjudication upon the merits unless the court, in its order for dismissal, otherwise specifies." Civ.R. 41(B)(3). In its August 14, 2023 decision, the probate court did not specify that its dismissal was without prejudice.

{¶ 28} "The decision to dismiss a complaint for failure to prosecute is within the sound discretion of the trial court, and an appellate court's review of such a dismissal is confined solely to the question of whether the trial court abused its discretion." *Jones v. Hartranft*, 78 Ohio St.3d 368, 371, 678 N.E.2d 530 (1997), citing *Pembaur v. Leis*, 1 Ohio St.3d 89, 91, 437 N.E.2d 1199 (1982). "The term 'abuse of discretion' as it applies to a dismissal with prejudice for lack of prosecution 'implies an unreasonable, arbitrary or unconscionable attitude on the part of the court in granting such motion.' " *Id.*, citing *Pembaur* at 91.

{¶ 29} "One of the considerations militating against dismissal with prejudice is the tenet that disposition of cases on their merits is favored in the law." (Citation omitted.) *Id.* "That precept has spawned decisions that curtail a trial court's discretion to dismiss." (Citations omitted.) *Id.* "Thus, although reviewing courts espouse an ordinary 'abuse of discretion' standard of review for dismissals with prejudice, that standard is actually heightened when reviewing decisions that forever deny a plaintiff a review of a claim's merits." *Id.* at 372.

{¶ 30} "Proper factors for consideration in a Civ.R. 41(B)(1) dismissal with

prejudice include the drawn-out history of the litigation, including a plaintiff's failure to respond to interrogatories until threatened with dismissal, and other evidence that a plaintiff is deliberately proceeding in dilatory fashion or has done so in a previously filed, and voluntarily dismissed, action." (Citations omitted.) *Jones* at 372. The probate court did not find that any of these types of factors existed in the two cases before us in this appeal. Rather, the sole basis the probate court gave for dismissing Appellant's petitions was that Appellant had failed to pay $72 in court costs that had been assigned to date across the two cases.

{¶ 31} R.C. 2323.31 allows courts of common pleas to require an advance deposit as security for fees or costs when a civil action is filed. However, if a litigant is indigent and is unable to make an advance deposit or security for fees or costs, the litigant may file an affidavit of indigency with the court to avoid the advance deposit requirement. R.C. 2323.31; R.C. 2323.311(A)-(B).

{¶ 32} "In order to qualify as an indigent litigant, the applicant shall file with the court in which a civil action or proceeding is filed an affidavit of indigency[.]" R.C. 2323.311(B)(1). Once the affidavit of indigency is filed, "the clerk of the court shall accept the action or proceeding for filing." R.C. 2323.311(B)(3). The judge of the court in which the action is filed must then review the affidavit of indigency and "shall approve or deny the applicant's application to qualify as an indigent litigant." R.C. 2323.311(B)(4). The judge "shall approve the application if the applicant's gross income does not exceed one hundred eighty-seven and five-tenths per cent of the federal poverty guidelines * * * and the applicant's monthly expenses are equal to or in excess of the applicant's liquid

assets[.]" *Id.* If the application is approved, the clerk shall waive the advance deposit or security and the court shall proceed with the civil action or proceeding. If the application is denied, "the court shall issue an order granting the applicant whose application is denied thirty days to make the required advance deposit or security, prior to any dismissal or other action on the filing of the civil action or proceeding." *Id.*

{¶ 33} After the court makes its initial determination of indigency and the clerk waives the advance deposit or security, the court may conduct a hearing "to inquire into the applicant's status as an indigent litigant." R.C. 2323.311(B)(5). The judge "shall affirm the applicant's status as an indigent litigant if the applicant's gross income does not exceed one hundred eighty-seven and five-tenths per cent of the federal poverty guidelines * * * and the applicant's monthly expenses are equal to or in excess of the applicant's liquid assets[.]" *Id.* "If the court finds that the applicant qualifies as an indigent litigant, the court shall proceed with the action or proceeding." *Id.* If, however, the court finds that the applicant no longer qualifies as an indigent litigant, "the court shall issue an order granting the applicant whose motion is denied thirty days to make a required deposit or security, prior to any dismissal or other action on the filing or pendency of the civil action or proceeding." *Id.*

{¶ 34} "The language of R.C. 2323.31 and 2323.311 is mandatory. These provisions require courts to waive advance deposit or security requirements associated with civil actions or proceedings for those who qualify." *Crenshaw v. Howard*, 2022-Ohio-3914, 200 N.E.3d 335, ¶ 37 (8th Dist.). "However, R.C. 2323.31 and 2323.311 do not address whether court costs should be waived in their entirety; they only waive the

requirement of an advance deposit or security for costs. Notwithstanding R.C. 2323.31 and 2323.311, court costs may still be assessed *at the conclusion of a case.*" (Emphasis added.) *Id.*

{¶ 35} Further, R.C. 2746.10 addresses the possibility of assessing court costs on indigent litigants as they accrue. That statute provides, in pertinent part:

> If with respect to the filing of any civil action or proceeding * * *, a party qualifies as an indigent litigant as set forth in section 2323.311 of the Revised Code, the clerk of the court shall receive and file the civil action or proceeding * * * and the court shall waive any advance deposit or security for filing of the civil action or proceeding * * *, any payment in advance for any taxable costs, including fees for publication or service of process by other means, and any payment in advance of any fee required in connection with prosecuting or advancing the civil action or proceeding * * *.

{¶ 36} "The determination of indigence for purposes of whether a plaintiff should be required to pay filing fees and court costs 'is typically granted liberally in order to preserve the due process rights of litigants and guarantee an access to judicial process and representation.' " *Guisinger v. Spier*, 166 Ohio App.3d 728, 2006-Ohio-1810, 853 N.E.2d 320, ¶ 6 (2d Dist.), quoting *Evans v. Evans*, 10th Dist. Franklin Nos. 04AP-816 & 04AP 1208, 2005-Ohio-5090, ¶ 23. "While courts traditionally waive filing fees and costs for indigent persons in order to promote the interests of justice, it is within the court's discretion whether indigency status is proper in a particular case." *Id.,* quoting *Wilson v. Dept. of Rehab. & Corr.*, 138 Ohio App.3d 239, 243, 741 N.E.2d 152 (10th Dist.2000).

However, it is important to note that the General Assembly's enactment of R.C. 2323.311 and R.C. 2746.10 in March 2019 helped make the definition of an indigent litigant more uniform across the courts in Ohio. Therefore, a court's discretion to determine that a litigant is not indigent is more limited than it once was.

{¶ 37} The probate court properly found that Appellant was indigent under the definition in R.C. 2323.311. As a result, the probate court waived the advance deposit or security for fees or costs. At no time did the probate court find that Appellant was no longer indigent. Therefore, the probate court did not have the authority to require Appellant to pay costs and fees in advance as a precondition to proceeding with her petitions. R.C. 2323.311; R.C. 2746.10.

{¶ 38} The sole reason the probate court gave for requiring Appellant to pay in advance for costs and fees was the probate court's budgetary concerns. As the probate court explained:

[I]t appears that Petitioner is asking that the Court, rather than the Petitioner, bear the cost of the litigation. This presents a potential budgetary problem for this Court and the Board of County Commissioners, given the appropriation and annual budget constraints. It also raises questions as to who shall pay for marriages, guardianships and other proceedings in the Court. In other words, this Court does not have unlimited resources to assist parties, no matter how altruistic the case.

This Court is well-aware of Petitioner's status and situation in trying to raise two children on a limited income and with limited resources (which

may relate to the best interests finding if it were to progress to that point).

This Court is sympathetic but must maintain a budget and Petitioner's filing(s) trigger broader policy implications in this Court. Additionally, this Court has also been approached by other groups that have asked that costs be waived—whereby the Court denied the request. For consistent and equal treatment, a denial makes sense.

Decision (Aug. 14, 2023), p. 8.

**{¶ 39}** Similar budgetary concerns were considered by the United States Supreme Court in *Boddie v. Connecticut*, 401 U.S. 371, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). There, appellants were welfare recipients residing in the State of Connecticut challenging certain state procedures for the commencement of litigation, including requirements for payment of court fees and costs for service of process, which restricted their access to the courts in their effort to bring an action for divorce. *Id.* at 372. It was undisputed that the appellants were unable to pay the court fees required by statute or the cost incurred for the service of process. The clerk of court would not accept the appellants' papers for filing until an entry fee had been paid, and subsequent efforts to obtain a judicial waiver of the fee requirement and to have the court effect service of process were to no avail. *Id.* at 373. The appellants sought a judgment declaring that Connecticut's statute and service of process provisions requiring payment of court fees and expenses as a condition precedent to obtain court relief were unconstitutional as applied to the indigent appellants. They also sought an injunction ordering the appropriate officials to permit them to proceed with their divorce actions without payment of fees and costs. *Id.*

**{¶ 40}** In response to appellants' arguments in *Boddie*, the State of Connecticut argued that it had a significant interest in using court fees and process costs to allocate scarce resources. The Supreme Court held that this interest was insufficient to deny the appellants their access to court. In particular, the Supreme Court explained:

> The arguments for this kind of fee and cost requirement are that the State's interest in the prevention of frivolous litigation is substantial, its use of court fees and process costs to allocate scarce resources is rational, and its balance between the defendant's right to notice and the plaintiff's right to access is reasonable.
>
> In our opinion, none of these considerations is sufficient to override the interest of these plaintiff-appellants in having access to the only avenue open for dissolving their allegedly untenable marriages. Not only is there no necessary connection between a litigant's assets and the seriousness of his motives in bringing suit, but it is here beyond present dispute that appellants bring these actions in good faith. Moreover, other alternatives exist to fees and cost requirements as a means for conserving the time of courts and protecting parties from frivolous litigation, such as penalties for false pleadings or affidavits, and actions for malicious prosecution or abuse of process, to mention only a few.

*Id.* at 381.

**{¶ 41}** The Ohio State Supreme Court addressed similar budgetary concerns in *State ex rel. Blevins v. Mowrey*, 45 Ohio St.3d 20, 543 N.E.2d 99 (1989). There, a

plaintiff in a divorce action filed an affidavit of indigency with the trial court requesting a waiver of the filing fee prior to filing her divorce claim. The trial court granted her request and waived the filing fee. A few months later, she filed a motion for service by publication to be made to her husband pursuant to Civ.R. 4.4 and sought a waiver of prepayment of the costs of publication. She asked that the publication costs be added to the court costs of the divorce. *Id.* at 20-21. The trial court had found that the plaintiff's indigency did not require the waiving of the prepayment of the costs of publication, and it ordered service of process by publication only upon prepayment of the necessary costs. *Id.* at 21. The plaintiff filed an original action in mandamus in the Ohio Supreme Court, seeking to compel the trial court and court clerk to effect service of process by publication without prepayment of the costs of publication and to add the costs to the court costs of the divorce action.

**{¶ 42}** The Ohio Supreme Court began its analysis by noting that "[a] legitimate question arises as to why the public should be required to pay the publication costs of an indigent divorce plaintiff." *Id.* at 22. The Court then continued, "There is a further legitimate concern that requiring public entities to prepay publication costs may be too expensive. While a concern, this burden pales when compared with the alternative that poor litigants, unable to locate their spouses, would be denied access to our courts. *Due process cannot be sacrificed on the altar of cost.*" (Emphasis added.) *Id.* at 23.

**{¶ 43}** The *Boddie* and *Mowrey* decisions and their respective weighing of access to courts versus budgetary concerns are instructive on the issue before us. Moreover, although we are not bound by court decisions from other states, we are persuaded by the

Florida Supreme Court's decision in *Grissom v. Dade County*, 293 So.2d 59 (Fla.1974), which addressed whether a probate court should dismiss an indigent petitioner's attempt to adopt solely due to her inability to pay post-filing costs as they accrued. In *Grissom*, an indigent widow wanted to adopt a child for whom she had legal custody, had cared, and had acted in the parental capacity since the child's birth. But she was unable to afford the cost of publishing a notice of the suit directed to the natural mother, who could not be located. The indigent widow sought either to have Dade County pay the cost of publication or to have the court declare that the statute requiring such publication was unconstitutional in its application.

{¶ 44} The Florida Supreme Court found that the indigent widow had been precluded from court because she could not afford the publication fee necessary to obtain jurisdiction over the errant natural mother. *Id.* at 61. *Grissom* acknowledged that the *Boddie* court had noted that its decision was restricted only to the facts of that case, which involved a marriage-divorce situation. *Id.* However, the Florida Supreme Court explained that reading *Boddie*, along with subsequent decisions of the United States Supreme Court, made it clear that "*Boddie* is limited to a class of actions where the State has exclusively made judicial process the only method of altering a fundamental human relationship; excepting financial and economic relationships." *Id.* at 62. The Florida court then explained that adoption proceedings fit within this limited class of actions, because adoption proceedings are vested in the state court and exist only by statute. The *Grissom* court concluded:

> The purpose of adoption proceedings is to extinguish certain rights

of the natural parents and to establish such rights in the adoptive parents. * * * In such cases there is no distinction between the dissolution of a marriage and dissolution of a parent-child relationship. Society's need for a procedure to terminate a marriage is certainly no greater than society's need for a procedure whereby homes with parental relationships are provided for parentless children.

The merits of the appellant's right to adopt this child is clearly not the issue. What is at issue is her right of access to the courts to see if she is a fit person to adopt this child.

She is clearly challenging the right to invoke the jurisdiction of the court through the only method available statutorily.

*Id.*

{¶ 45} We agree with the Florida Supreme Court that the right at issue in this appeal is Appellant's right of access to the courts to see if she is a fit person to adopt her grandchildren. After Appellant proved her indigent status, the probate court properly waived the initial filing fee. However, only a few months later, the probate court decided to dismiss her adoption petitions because she had not paid in advance the $36 in costs that had been assessed in each case. The question becomes whether Appellant really had access to the court when the probate court properly waived the advance security deposit and filing fee but then soon thereafter dismissed her petitions for failure to advance the next set of costs, in spite of its finding that Appellant was indigent. The answer to that question is no.

{¶ 46} The probate court's actions also directly conflicted with R.C. 2746.10. There, the General Assembly made it clear that the court *shall* waive any payment in advance for any taxable costs and any payment in advance of any fee required in connection with advancing the civil action or proceeding. *Id.* The probate court ignored this statute and conditioned the advancement of Appellant's actions on her advance payment of taxable costs and fees. Moreover, we are concerned that the actions of the probate court in the instant case, if applied consistently across its cases involving indigent petitioners, would effectively eliminate access for indigent petitioners in adoption cases and all other cases before the probate court. By requiring indigent petitioners to essentially begin a payment plan soon after the initial filing fee is waived and then conditioning the ability to proceed in the case solely on the advance payment of fees or costs, the probate court would effectively eliminate the relief the Ohio General Assembly mandated in R.C. 2323.311 and R.C. 2746.10. In short, allowing a court to dismiss cases of indigent petitioners before costs are assessed at the end of the case due solely to the petitioners' inability to advance costs contradicts the plain language of R.C. 2323.311 and R.C. 2746.10, as well as the strong guidance provided by the United States Supreme Court and the Ohio Supreme Court. Therefore, we must conclude that the probate court abused its discretion when it dismissed Appellant's petitions based solely on her failure to pay costs or fees in advance.

{¶ 47} The third assignment of error is sustained.


V. Conclusion

{¶ 48} Having sustained Appellant's first and third assignments of error, we will reverse the judgments of the probate court and remand this cause for further proceedings consistent with this opinion.

. . . . . . . . . . . . .

WELBAUM, J. and TUCKER, J., concur.